LEGAL AID SOCIETY OF SAN DIEGO, INC.
Branden Butler (SBN 265127)
*brandenb@lassd.org*
Rosalina Spencer (SBN 259866)
*rosalinas@lassd.org*
110 South Euclide Avenue
San Diego, CA 92114
Tel: (619) 471-2623
Fax: (619) 471-2788

BRANCART & BRANCART
Christopher Brancart (SBN 128475)
*cbrancart@brancart.com*
Post Office Box 686
Pescadero, CA 94060
Tel: (650) 879-0141
Fax: (650) 879-1103

Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **ERIKA MACIAS, et al.,**<br><br>**Plaintiff,**<br><br>**vs.**<br><br>**MYRON LANGE,**<br><br>**Defendant.** | **Case No. 14-cv-2763-GPC-JMA**<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT [ECF 46 and 47]** |

//

//

//

//

//

//

//

//

//

## TABLE OF CONTENTS


I. INTRODUCTION. . . . . 1

II. STATEMENT OF FACTS. . . . . 1

A. Plaintiff Edith Macias. . . . . 1

B. Plaintiff Cynthia Rich. . . . . 7

III. LEGAL STANDARD ON SUMMARY JUDGMENT. . . . . 10

IV. ARGUMENT. . . . . 11

A. Legal Framework for Analyzing Sexual Harassment Claims. . . . . 11

B. Summary Judgment on Plaintiffs' Fair Housing Act, FEHA, Unruh Act and Civil Code § 51.9 Claims Should be Denied. . . . . 14

*1. Summary judgment must be denied on Erika Macias's sexual harassment claims.* . . . . 14

*2. Summary judgment must be denied on Cynthia Rich's sexual harassment claims.* . . . . 16

*3. Summary judgment must be denied on plaintiffs' Ralph Act claims.* . . . . 18

*4. Summary judgment must be denied on plaintiffs' quiet enjoyment claims.* . . . . 19

*5. Summary judgment must be denied on plaintiffs' claims for invasion of privacy.* . . . . 20

V. CONCLUSION. . . . . 21

# TABLE OF AUTHORITIES

***CASES***


*Andrews v. Mobile Aire Estates,* 125 Cal. App. 4th 578 (2005).. . . . . . . . . . . . . . . 20

*Beliveau v. Caras,* 873 F. Supp. 1393 (C.D. Cal. 1995). . . . . . . . . . . . . . . . . . 12, 15

*Brown v. Smith,* 55 Cal. App. 4th 767 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

*DiCenso v. Cisneros,* 96 F.3d 1004 (7th Cir.1996).. . . . . . . . . . . . . . . . . . . 11, 12, 13

*California v. Campbell,* 138 F.3d 772 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . 11

*Ellison v. Brady,* 924 F.2d 872 (9th Cir.1990). . . . . . . . . . . . . . . . . . . . . . 12, 14, 17

*Geiger v. Hartford Life Ins. Co.,* 348 F. Supp. 2d 1097 (E.D. Cal. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Glover v. Jones,* 522 F. Supp. 2d 496 (W.D.N.Y. 2007). . . . . . . . . . . . . . . . . . 11, 15

*Goldsmith v. Bagby Elevator Co.,* 513 F.3d 1261 (11th Cir. 2008). . . . . . . . . . . . . 18

*Harris v. Forklift Sys., Inc.,* 510 U.S. 17 (1993). . . . . . . . . . . . . . . . . . . . . . . . 13, 17

*Hernandez v. Hillsides, Inc.,* 47 Cal.4th 272 (2009).. . . . . . . . . . . . . . . . . . . . . . . . 21

*Heyne v. Caruso,* 69 F.3d 1475 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Honce v. Vigil,* 1 F.3d 1085 (10th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Hughes v. Pair,* 46 Cal. 4th 1035 (2009). . . . . . . . . . . . . . . . . . . . . . . . . 11, 12, 13

*Meyer v. Holley,* 537 U.S. 280 (2003).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75 (1998). . . . . . . . . . . . . . . 13

*People of State of N.Y. by Abrams v. Merlino,* 694 F. Supp. 1101 (S.D.N.Y. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Porten v. University of San Francsico,* 64 Cal.App.3d 825 (1976). . . . . . . . . . . . 20

*Quigley v. Winter,* 598 F.3d 938 (8th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Rojas v. Roman Catholic Diocese of Rochester,* 660 F.3d 98 (2d Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Salisbury v. Hickman,* 974 F. Supp. 2d 1282 (E.D. Cal. 2013). . . . . . . . . . . . . 13, 20

*Triton Energy Corp. v. Square D. Co.,* 68 F.3d 1216 (9th Cir. 1995). . . . . . . . . . 11

*Williams v. Gen. Motors Corp.,* 187 F.3d 553 (6th Cir. 1999). . . . . . . . . . . . . . . . 13

*Williams v. Poretsky Mgmt., Inc.,* 955 F. Supp. 490 (D. Md. 1996).. . . . . . . . . 11, 13

*Winarto v. Toshiba America Electronics Components, Inc.*,
274 F.3d 1276 (9th Cir. 2001). . . . . . . . . . 19

*Zamora v. Sacramento Rendering Co.*,
2007 WL 137239 (E.D. Cal. Jan. 17, 2007), . . . . . . . . . . 19

***STATUTES***

42 U.S.C. § 3604(b). . . . . . . . . . 11, 12

42 U.S.C. § 3617. . . . . . . . . . 12

24 C.F.R. § 100.400(c)(2). . . . . . . . . . 12

24 C.F.R. § 100.65(b)(4). . . . . . . . . . 12

Fed. R. Civ. P. 56(a). . . . . . . . . . 11

Fed. R. Evid. 404(b). . . . . . . . . . 18

Fed. R. Evid. 404(b), 415. . . . . . . . . . 18

Fed. R. Evid. 415. . . . . . . . . . 18

Cal. Civ. Code § 51.7. . . . . . . . . . 18

## I. INTRODUCTION

This is a federal Fair Housing Act case in which plaintiffs – two former tenants of defendant Myron Lange – allege that defendant sexually harassed them while they lived in properties owned and operated by Lange. Defendant has separately moved for summary judgment against both plaintiffs, (ECF 46 and 47), asking the Court to construe the facts in the light most favorable to him. The material facts are in dispute, and resolution of those disputes and determination of the appropriate inferences to be drawn are tasks reserved for trial. Plaintiffs have significant evidence that defendant engaged in a longstanding pattern of sexual harassment and defendant's motions, based on his self-serving spin on the facts, should be denied in their entirety.

## II. STATEMENT OF FACTS

Defendant Myron Lange is the owner of approximately eight rental houses and apartments in the San Diego area. (Deposition of Myron Lange, Vol. II ["Lange Depo"] at 127:14-19, Depo. Exh. 6, attached as Exhibits 5 and 6 to the Declaration of Christopher Brancart filed herewith ["Brancart Dec."].) After retiring from a career in the Navy in 1980, Lange obtained his real estate license and has been self-employed since then. (Lange Depo. 108:5-109:3.)

### A. Plaintiff Erika Macias

Plaintiff Erika Macias, her husband and children, moved a house on Jewell Drive in San Diego owned by Mr. Lange in 2001. (Deposition of Erika Macias attached as Exhibit 1 to the Brancart Dec. ["Macias Depo."] at 29:23-25.) Lange started sexually harassing Macias after Macias's husband left, sometime after 2007. (Macias Depo. 90:23-91:8; 92:6-12; 263:22-25.) The first occasion occurred when Macias went to Lange's home in Lemon Grove to pay the rent. (Macias Depo. 91:3-8.) Lange insisted that Macias pay the rent in cash, so she paid it in person. (Macias Depo. 135:15-19.) Once Macias entered the house, Lange said, "hold on," then went and locked the front and back doors. (Macias

Depo. p. 91:9-12). Defendant then approached Macias and grabbed her around her waist and told her that she had beautiful breasts and asked to kiss her. (Macias Depo. p. 91:13-15). Macias pushed Defendant away and raised her voice loudly, telling him that she only came to pay her rent. (Macias Depo. 91: 263:16-20.) She said, "Look, Mr. Lange. I'm going to pretend this isn't happening." (Macias Depo. 91:16-17.) Lange backed off because he saw that she was not happy – she was shaking and scared. (Macias Depo. 91:21-23.) Macias told him that her brother and boyfriend were outside. (Macias Depo. 91:24-25.) She was afraid that he would have tried to go further if she had not pushed him away or if he had not known there was someone outside waiting for her. (Macias Depo. 263:16-20.) Macias called Rito Chavez, Lange's maintenance/handyman, crying and telling him what had happened. (Macias Depo. 93:6-11.) Chavez confirmed that Macias had complained to him about Lange's sexual harassment when he was deposed in this action. (Deposition of Rito Chavez attached as Exhibit 3 to the Brancart Dec. ["Chavez Depo."] at 76:16-77:11.)

After that incident, Lange continued to made sexual advances when Macias was cleaning his properties. After Macias's husband left and she could not work, she started being late on her rent. (Macias Depo. 93:14-18; 94:2-8.) Lange asked her to clean his properties to help pay the rent. (Macias Depo. 94:2-8.) She would clean Lange's personal residence and his rentals. (Macias Depo. 94:21-24.) Lange was always present when she cleaned his home and sometimes present when she cleaned the other properties. (Macias Depo. 94:25-95:5.) At least twice while Macias was cleaning Lange's residence, he asked to see her breasts. (Macias Depo. p. 98:9-13; 107:10-13). Lange would sit on the couch with a shot of tequila and watch her, telling her where to clean. (Macias Depo. 101:22-102:2; 102:21-103:6.) During one incident, Macias was cleaning on the floor and Lange told her that she looked good on her knees and asked to see her breasts. (Macias Depo. p. 100:12-17). Another time, she was cleaning around the couch, leaning

and wiping, and Lange said, "Ooh, let me see those beautiful breasts again." (Macias Depo. 107:16-22.) Macias tried to ignore Lange's comments because she was afraid of being evicted. (Macias Depo. p. 104:4-11). Being a low-income, single mother with a large family, she could not afford to move. (Macias Depo. 104:16-17.)

Although sometimes Lange paid Macias $10 per hour to clean, as opposed to crediting the work toward rent or late fees, (Macias Depo. 102:3-11, 107:23-108:13; 268:1-2), Lange made clear to her that the cleaning work was part of their landlord/tenant relationship – if Macias declined a cleaning job from Lange, he would tell her "I guess you don't want to work. You don't want to live in my properties," or "maybe you want to get evicted." (Macias Depo. 106:5-21; 264:9-25.). Macias was late on the rent often and Lange would tell her to work so her rent would not be late. (Macias Depo. 266:2-15; 267:8-20.) Lange always connected Macias's refusal to work with somehow leading to her eviction and Macias was afraid she would lose her housing. (Macias Depo. 106:11-21.)

Lange told Macias she had beautiful breasts more than ten times. (Macias Depo. 120:9-20.) Every few months, Lange made comments to her about her good looking breasts when Macias paid her rent. (Macias Depo. 122:4-123:4.) She would respond by telling him, "Mr. Lange, don't say that." (Macias Depo. 123:1-4.) He told her she was hard to resist and had a beautiful body. (Macias Depo. 124:11-16; 121:16-21.) Lange has asked Macias to marry him, to leave her children with her mother, and to move in with him. (Macias Depo. 62:22-25). On several occasions, Lange asked Macias to kiss him. (Macias Depo. 63:12-17). Lange hugged Macias on two occasions tight against his body. (Macias Depo. 147:25-148:6).

Because she did not like being alone with Lange while she cleaned his house, Macias tried to take one of her teenaged daughters with her as often as possible. (Macias Depo. 114:23-15:4.) Lange still acted in sexual manner toward

her. (Macias Depo. 109:11-112:10). During one incident, Lange walked by Macias while she was cleaning and patted her butt while Macias's daughter Elisa was present. (Macias Depo. 111:15-112:5). During another incident, Elisa saw Lange brush his elbow against Macias' breast. (Macias Depo. 113:17-23). Macias' daughter Erika was present during two additional incidents when Lange bumped Macias' breast and butt. (Macias Depo. 115:22-116:9). Macias would ask Lange to stop touching her, but he would just laugh. (Macias Depo. 118:6-21).

By agreement with Lange, Macias paid her rent on the 10th of the month. (Macias Depo. 268:8-13.) On June 10, 2013, Macias asked Lange for an extension of time to pay rent because her boyfriend had been arrested and she needed more time. (Macias Depo. 52:8-10; 60:6-14, 24-25). Lange agreed to grant an extension until June 24, 2013. (Macias Depo. 61:1-4). On June 24, 2013, Macias went to Lange's house to ask for another extension to pay rent. (Macias Depo. 55:20-23). When she arrived, Lange was about to have a tequila and offered her one, which she accepted. (Macias Depo. 64:15-21.) They conversed for a few minutes, then Macias told him that she was there to talk about the rent. Macias said she had a really big favor to ask, explaining that she needed more time to pay her rent because her boyfriend was in jail and she was having a difficult time. (Macias Depo. 65:5-23.) Lange said, "I'll do you a favor if you do me a favor." She said, "oh, sure," thinking he wanted her to clean his property. He said, "I would like if you gave me a really good blow job." (Macias Depo. 55:21-56:10.) Lange then came close to Macias' face and leaned towards her face to kiss her and told her to just let him kiss her. (Macias Depo. 82:2-14). Lange was close enough that Macias felt his breath on her face. (Macias Depo. 90:16-18). Macias backed away and laughed nervously, asking Lange why he was doing that, protesting that they were in a tenant relationship. (Macias Depo. pp. 66:21-67:2). Lange told Macias it was because she is hard to resist. (Macias Depo. p. 67:3-5). Macias told Lange that she had to leave and she was going to pretend he did not ask her for a

blow job. (Macias Depo. p. 67:6-8). Lange then laughed and asked, "well, how about you get me somebody to help me out." (Macias Depo. p. 67:9-11). He asked Macias who he was with and, when she said her sister-in-law was in the car, Lange said, "let me check her out." (Macias Depo. 67:9-17.) Macias protested that her sister-in-law was young and married, but Lange followed Macias out to her car, wanting to be introduced. (Macias Depo. 59:10-16; 67:19-22). Macias told him she had to leave, got into the car and drove away. (Macias Depo. 68:23-25.) Macias was devastated and went home crying. (Macias Depo. 80:21-22.) She felt that Lange would evict her because she refused to give him the blow job. (Macias Depo. 80:16-25.)

Sometime prior to the 4th of July, Lange asked Macias to give him a ride to the Del Mar Fair because he needed to make a purchase. (Macias Depo. 82:23-83:6.) Lange could not drive himself. (Id.) He told her "not to worry," it would be just a professional ride. (Macias Depo. 83:19-21.) Macias did not believe him, but she was afraid she would be evicted if she did not drive him. (Macias Depo. p. 83:22-24). Although Macias did not want to be alone with Lange, she felt that she would be safe because they were going to a public place. (Macias Depo. 115:9-17.) Although the trip was supposed to be just an hour, it ended up being hours. (Macias Depo. 84:15-22.)

On July 5, 2013, Macias brought her rent – $1300 in cash – to Lange's house. (Macias Depo. 52:17-53:2; 87:9-11.) He asked her to come in, but she refused – she was afraid to go in, considering Lange had previously locked her inside his house and considering the recent escalation in his sexual misconduct. (Macias Depo. 68:9-20; 87:16-17.) He said, "Don't worry. I'm not going to do anything." (Macias Depo. 87:19-20.) After Macias gave Lange the June rent, she told him that she would pay the July rent in a few days. (Macias Depo. 68:23-69:4.) Lange told her that she needed to pay the current rent plus pay for the fixtures in the bathroom or he would sell the property. (Macias Depo.

53:6-12.) Lange said the rental agreement had been for Macias to pay for fixture and repairs in the bathroom. (Macias Depo. 53:14-21.) There was no such agreement. (Macias Depo. 53:22-54:1.)

A day or two later, Macias asked Lange to give her a 3-day notice for the July rent. (Macias Depo. 138:11-139:1.) She understood that she might be able to get rental assistance from the welfare department to help pay her July rent if she had such a 3-day notice. (Macias Depo. 140:11-19.) Lange gave her the notice, but it turned out Macias was not eligible for the assistance. (Macias Depo. 140:20-25.)

On July 10th, the day July rent was due, Macias paid $900 in rent. She refused to pay the full amount of rent because the bathroom was not usable. (Macias Depo. 54:16-55:10; 88:10-15.) After Macias paid the rent, Lange gave her an eviction notice. (Macias Depo. 72:1-7.) Macias argued with Lange how he was now evicting her when she had just paid the rent. (Macias Depo. 72:8-9.) She began to cry, telling him she had put up with his harassment for years and now he was evicting her because she would not give him a blow job. (Macias Depo. 72:12-17.)

After Macias refused to give Lange a blow job, Lange kept changing the reason for wanting to evict Macias. First it was because she had not paid June rent, but after she paid that it became because she had not paid July rent, but after she paid that it became because she did not fix the bathroom fixtures. (Macias Depo. 217:10-17.) Macias believed that she was going to be evicted no matter what because she had refused to give Lange a blow job. (Macias Depo. 80:23-81:7)

Macias hired an attorney to write a letter to Lange complaining of his sexual harassment and demands that she pay for the bathroom fixtures. After Lange received a letter form the attorney, he eventually filed an unlawful detainer against Macias. (Macias Depo. p. 78:15-79:4; 243:12-19.)

While these events were occurring, Macias complained to Rito Chavez, Lange's maintenance man. (Chavez Dec. 37:8-38:2.) Chavez rents from Lange, but sometimes exchanges work for rent. (Chavez Dec. 30:14-17.) Rito acknowledges that Macias complained to him prior to the lawsuit that Lange had been sexually harassing her. (Chavez Dec. 76-79, 87-89.) Macias complained about Lange's sexual harassment on three separate occasions. (Chavez Dec. 87:24-88:8.) Each time, Macias was visibly upset when she described Lange's sexual harassment. (Chavez Dec. 78:13-15.) She complained that Lange had grabbed her buttocks. (Chavez Dec. 78:23-25.)

**B. Plaintiff Cynthia Rich**

In October 2011, Cynthia Rich contacted a real estate agent about renting a house on Bonita Street in Lemon Grove owned by Myron Lange. (Deposition of Cynthia Rich attached as Exhibit 2 to the Brancart Dec. ["Rich Depo."] 29:3-13.) The agent told Rich and her husband to contact the tenant to see the property. (Rich Depo. 29:14-30:1.) After seeing the house, Rich and her husband met with the real estate agent and signed the lease. Only afterward did they meet Myron Lange. (Rich Depo. 30:2-31:8; 32:1-4.) When they later did the walk thru with Lange, he pointed out the lot in the back that he owned, but did not tell them what it was used for or anything else about it. (Rich Depo. 33:9-34:21.) There was a non-operation utility truck on the property, but when she moved in, Rich was unaware that the truck belonged to Lange. (Rich Depo. 96:14-17.)

Lange began sexual harassing Rich from the time she moved into his rental property. (Rich Depo. 52:1-6). The harassment continued for several years. (Rich Depo. 52:9-10). Lange continuously came to the property unannounced. (Rich Depo. 53:3-7.) He showed up anytime, coming onto the property the Riches were renting, walking in the front yard, side yard, backyard and pool area. (Rich Depo. 53:8-22.) The visits were in the morning and afternoon on any day of the week, including times when Rich's husband was not at home. (Rich Depo. 53:11-17).

Sometimes Lange came when Rich was on her way to work or sometimes when she was outside working in the yard. (Rich Depo. 160:24-161:5.) Rich asked Lange to stop coming to the property unannounced, but Lange responded that it was his property. (Rich Depo. 55:22-56:6).

During Lange's unannounced visits, he would exhibit sexually inappropriate behavior and gestures, and engage Rich in unsolicited communication about his personal life. (Rich Depo. 45:16-19). On most occasions when they interacted, Rich felt that Lange was coming on to her and "very flirtatious." (Rich Depo. 136:5-16.) Lange would use inappropriate mannerisms and inflections in his voice. (Rich Depo. 63:24-25). Lange told her that if she weren't married, he would be there first to approach her. (Rich Depo. 65:2-4.) He said that a good looking women like her should be aware of the way they looked and dress because she is sexy. (Rich Depo. pp. 64:22-65:5). He told her that she dressed sexy and any man would be lucky to have her as a companion. (Rich Depo. p. 89:6-10). He also told her that if she ever needed a new husband, he would be available. (Rich Depo. p. 89:11-15).

He told her that she dressed sexy between 20 and 30 times. (Rich Depo. pp. 102:23-103:10). The first time Lange told her she dressed sexy was when he had his shirt off working in the yard. (Rich Depo. 103:11-17). Also, when he had his shirt off, Lange told Rich to look at him, his body, and his arms. (Rich Depo. 141:19-24). Lange told Rich that she was really hot. (Rich Depo. 149:22-25). Lange also said that he wished he could wake up next to her. (Rich Depo. 147:22-148:4). Comments such as these occurred all of the time. (Rich Depo. 89:22-25). Lange would make these comments while he had his hands in his groin area, making Rich feel uncomfortable. (Rich Depo. 75:18-23.) He would adjust his pants, have his hand in pockets jiggling coins, and come into close contact with Rich by approaching her. (Rich Depo. p. 65:13-19). These interactions occurred on the Riches' part of the property in the front yard. (Rich Depo.

66:19-24). Lange would also make eye movements such as making his eyebrows go up and down like a winking gesture. (Rich Depo. p. 65:20-23). Rich felt uncomfortable because Lange looked at her like she was a piece of meat, a sexual person. (Rich Depo. 138:12-139:3.) She felt degraded by the way he treated her. (Rich Depo. 209:5-6.)

During one conversation, Lange told Rich about his night before and that he picked up women from a UFW and he drank all night. (Rich Depo. p. 105:10-19). He also told her about waking up hung over and that he had sex with a woman. (Rich Depo. 109:2-5). Lange would ask Rich about her friends and if any were "dateable" because he was seeking a relationship. (Rich Depo. 64:1-5). He asked Rich to hook him up with a "hot Latina" like her. (Rich Depo. 151:10-14). Lange would also ask Rich if she wanted to go with him to local taverns or bars. (Rich Depo. 64:6-11).

Rich did not "initiate" these contacts with Lange. When she saw him outside pacing back and forth on her property, she would go outside, asking him why he was on the property. (Rich Depo. 65:24-66:8; 161:14-16.) She would ask him if he needed help. (Rich Depo. 74:21-24.) She would ask him what he was doing on the property and asked if he would give them notice when he would be there. (Rich Depo. 99:18-23.) He said it was his property. (Rich Depo. 99:24-25.) Rich would go outside when Lange was on the property because her dogs would bark and she did not want Lange to get bit. (Rich Depo. 104:14-24). Lange told Rich to leave her rent check in his utility truck; when he came to pick up the check she would go outside to be sure he got it. At that point he would engage in inappropriate behavior or communication. (Rich Depo. 100:18-101:6.)

Lange tried to hug Rich a couple of times. (Rich Depo. p. 153:14-18). Lange would approach Rich and make her feel uncomfortable with such close contact. (Rich Depo. p. 64:17-18). Rich did not know how to disengage in conversations with Lange. (Rich Depo. p. 212:16-21). She thought that when she

backed away or told him that she could not talk anymore and tried to walk away that he would understand his conduct was unwelcome. (Rich Depo. 212:16-21.) She would try to leave, but he would start another conversation. (Rich Depo. 107:6-7.) When he was coming on to her, she would try to deflect the conversation, and he would get rude. (Rich Depo. 136:19-137:5.) She would say, “I really need to go,” and he would respond, “Why do you need to go,” using a different tone of voice. (Rich Depo. 136:12-137:22.) Rich felt that her tenancy would change if she did not put up with Lange. (Rich Depo. 206:17-207:9). Rich felt that if she did not interact with him, her tenancy would be in jeopardy. (Rich Depo. 208:9-11). Rich tried to stay in the house as much as possible to avoid Lange. (Rich Depo. 159:23-160:10; 160:11-18.) She kept the drapes closed because of Lange. (Rich Depo. 157:15-19.) Lange told Rich that he was changing her locks and he could come in and out of her house anytime he wanted, causing her to feel unsafe in her own home. (Rich Depo. 86:5-11). Lange told her she could not change the locks. (Rich Depo. 87:15-24).

Rich felt trapped and fearful. She felt she could not call the police because Lange had not physically assaulted her. She feared that nobody would believe her because it would be her word against Lange’s. (Rich Depo. 209:3-10.) She did not tell her husband about Lange’s sexual remarks or conduct because she was afraid of her husband’s reaction. (Rich Depo. 49:22-50:8; 52:8-13.) She did tell her husband that she wanted to avoid Lange after she was laid off and going to be home during the day; he told her to be sure and to lock the doors, keep the dogs in the house, and to be careful. (Rich Depo. 167:8-17.) So, Rich would hide in her house, keeping quiet, because she did not want to interact with Lange. (Rich Depo. 166:20-167:3.)

## III. LEGAL STANDARD ON SUMMARY JUDGMENT

Summary judgment is warranted only “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). A genuine issue of fact exists when the non-moving party produces evidence on which a jury could find in her favor. *Triton Energy Corp. v. Square D. Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995). Material facts are those that "might affect the outcome of the suit under the governing law." *California v. Campbell*, 138 F.3d 772, 782 (9th Cir. 1998); *Geiger v. Hartford Life Ins. Co.*, 348 F. Supp. 2d 1097, 1104 (E.D. Cal. 2004). Because sexual harassment cases require highly fact-sensitive legal determinations, such cases are not well-suited to disposition on summary judgment unless on the facts alleged no reasonable jurors could differ on the conclusion to be drawn. *Glover v. Jones*, 522 F. Supp. 2d 496, 504 (W.D.N.Y. 2007). Summary judgment on hostile environment claims should not be granted unless no fact finder reasonably could conclude that the conduct was so severe or pervasive as to create an abusive living environment. *Williams v. Poretsky Mgmt., Inc.*, 955 F. Supp. 490, 497 (D. Md. 1996).

## IV. ARGUMENT

### A. Legal Framework for Analyzing Sexual Harassment Claims.

Sexual harassment is a form of sex discrimination recognized and prohibited under the Fair Housing Act ("FHA"), the California Fair Employment and Housing Act ("FEHA") and the California Unruh Act. *DiCenso v. Cisneros*, 96 F.3d 1004, 1008 (7th Cir.1996) (FHA); *Brown v. Smith*, 55 Cal. App. 4th 767, 782 (1997) (applying FHA sex harassment concepts to FEHA housing discrimination claims based on sexual harassment); *Hughes v. Pair*, 46 Cal. 4th 1035, 1048 (2009) (Civil Code § 51.9 prohibiting sexual harassment in certain professional relationships, including landlord-tenant, is intended to conform to California [FEHA] and federal laws pertaining to sexual harassment in the workplace).

Sexual harassment may violate the Fair Housing Act's prohibition on discrimination in the terms or conditions of rental of housing because of sex, 42 U.S.C. § 3604(b), and/or its prohibition on interfering with the enjoyment of a

dwelling because of sex, 42 U.S.C. § 3617.[1] *See, e.g.*, *Beliveau v. Caras*, 873 F. Supp. 1393, 1394-97 (C.D. Cal. 1995) (§ 3604(b)); *People of State of N.Y. by Abrams v. Merlino*, 694 F. Supp. 1101 (S.D.N.Y. 1988) (§ 3617); *DiCenso*, 96 F.3d 1004, 1006 (7th Cir. 1996) (both). Likewise, sexual harassment may violate California Government Code §§ 12955(a) and 12927(c)(1) prohibiting sex discrimination in terms or conditions of rentals, and/or § 12955.7 prohibiting interference with the enjoyment of a dwelling because of sex. The Unruh Act, Civil Code § 51, prohibits discrimination based on sex in the operation of a business establishment, and Civil Code § 51.9 explicitly prohibits sexual harassment by, *inter alia*, landlords against tenants.

The Fair Housing Act, FEHA, Unruh and § 51.9 follow sexual harassment concepts originally derived from Title VII employment discrimination cases. *See DiCenso*, 96 F.3d at 1008; *Brown*, 55 Cal. App. 4th at 782 (FEHA); *Hughes*, 46 Cal. 4th at 1048 (§ 51.9). Under Title VII, sexual harassment may be proven by showing a "quid pro quo" or a "hostile environment." *Ellison v. Brady,* 924 F.2d 872, 875 (9th Cir.1990). In the housing context, "quid pro quo" harassment occurs when housing benefits are explicitly or implicitly conditioned on sexual

---

[1]Section 3604 makes it unlawful to discriminate in the terms, conditions, and privileges of the rental of a dwelling because of sex. 42 U.S.C. § 3604(b). HUD regulations implementing the FHA prohibit "[l]imiting the use of privileges, services or facilities associated with a dwelling because of . . . sex . . . or an owner, tenant or a person associated with him or her." 24 C.F.R. § 100.65(b)(4). Section 3617 makes it unlawful to "coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section [3604] of this title." 42 U.S.C. § 3617. HUD regulations prohibit "[t]hreatening, intimidating or interfering with persons in their enjoyment of a dwelling because of the . . . sex . . . of such persons." 24 C.F.R. § 100.400(c)(2). HUD's regulations implementing the Fair Housing Act are entitled to deference. *Meyer v. Holley*, 537 U.S. 280, 287 (2003).

favors. *Honce v. Vigil*, 1 F.3d 1085, 1089 (10th Cir. 1993). A hostile environment claim in the housing context is actionable when the offensive behavior is "sufficiently severe *or* pervasive" to alter the conditions of the housing arrangements. *DiCenso*, 96 F.3d at 1008 (citing *Honce,* 1 F.3d at 1090) (emphasis added). *See also Hughes*, 46 Cal. 4th at 1048 (Civil Code § 51.9 prohibits sexual harassment of a tenant by landlord that is "pervasive or severe")

Whether an environment is "hostile" or "abusive" can be determined only by looking at all the circumstances. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). Those circumstances, in the housing discrimination context, may include (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an use and enjoyment of the premises. *DiCenso*, 96 F.3d at 1008 (citing *Harris*, 510 U.S. at 23). No single factor is required. *Harris*, 510 U.S. at 23. This "totality-of-circumstances examination" should be viewed as the most basic tenet of a hostile environment claim. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 563 (6th Cir. 1999). *See also Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-82 (1998) (the "real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed"). Thus, the issue is not whether each incident complained of is sufficient, standing alone, to show a hostile environment, but whether – taken together – the incidents make out such a case. *Williams*, 187 F.3d at 562.

Sexual harassment by someone in a position of authority – like one's landlord – is more likely to be emotionally and psychologically threatening. *Salisbury v. Hickman*, 974 F. Supp. 2d 1282, 1293 (E.D. Cal. 2013). As the Ninth Circuit has recognized, "because women are disproportionately victims of rape and sexual assault, women have a stronger incentive to be concerned with sexual

behavior. Women who are victims of mild forms of sexual harassment may understandably worry whether a harasser's conduct is merely a prelude to violent sexual assault." *Ellison v. Brady*, 924 F.2d 872, 879 (9th Cir. 1991) (footnote omitted).

**B. Summary Judgment on Plaintiffs' Fair Housing Act, FEHA, Unruh Act and Civil Code § 51.9 Claims Should be Denied.**

***1. Summary judgment must be denied on Erika Macias's sexual harassment claims.***

Plaintiff Erika Macias seeks to prove sexual harassment based on both quid pro quo and a hostile environment. In *Quigley v. Winter*, 598 F.3d 938, 948 (8th Cir. 2010), the Eighth Circuit found that there was sufficient evidence of quid pro quo sexual harassment to sustain the jury's verdict where the tenant had asked about the likelihood of return of her security deposit and the landlord had "fluttered his hand against Quigley's stomach and said,'My eagle eyes have not seen everything yet.'" A reasonable jury could infer that the landlord was conditioning return of the security deposit on a sexual favor or seeing more of the tenant's body. *Id.* In context of years of harassment, Lange's request for sex in exchange for allowing Macias additional time to pay rent establishes quid pro quo sexual harassment.

A reasonable woman also would find Lange's conduct towards Macias to be intimidating, hostile, offensive or otherwise make housing less desirable. It was certainly offensive to Macias. Macias' deposition testimony, viewed in the totality and in the light most favorable to her, is sufficient for a fact finder to find that the harassment she endured was so severe or pervasive that a reasonable woman would find it interfered with her enjoyment of her housing. Lange's harassment of Macias took place over several years and varied in severity throughout her tenancy. The fact that she continued to reside in her housing – because she was a low-income single woman with children with nowhere else to go and therefore

*needed* to live in Lange's property – does negate the fact that both she, and a reasonable woman, would find that Lange's course of sexual harassment made her tenancy intimidating, hostile, offensive, or otherwise significantly less desirable. This evidence presents a genuine issue of material fact that precludes summary judgment on Rich's hostile environment and quid pro quo claims under the FHA, FEHA, Unruh Act[2] and § 51.9.

Lange dismisses his demands for sex as an "off color joke" and describes Macias as complaining about "mundane" behaviors. (ECF 47-1 at 13-14.) He also posits that Macias went to Lange's home "under her own free will" to drop off rent – ignoring the testimony that Lange insisted on being paid in cash. (Macias Depo. 135:15-19.) But these arguments depend on the Court viewing the evidence in a light most favorable to Lange, the moving party, and should be rejected

Lange's other arguments highlight his misunderstanding of the standard of review on a motion for summary judgment. For example, he attacks Macias's credibility – a question for trial. (ECF 47-1 at 10.) In doing so, he misapplies case law. Citing a case involving contradictions in a witness's sworn testimony, *Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 105-06 (2d Cir. 2011), Lange argues that this Court should grant summary judgment here on the same grounds. Lange picks at details where the allegations in the complaint vary from Macias's deposition testimony. The differences are immaterial and, in any event, Lange skips over the obvious distinction between Macias and Rojas: Rojas contradicted sworn testimony; Macias gave testimony that varied over details

---

[2]Contrary to defendant's motion, sexual harassment claims are cognizable under the Unruh Act, § 52 *See Beliveau v. Caras*, 873 F. Supp. 1393, 1401 (C.D. Cal. 1995).

alleged by counsel in a notice pleading, the original complaint. Lange also speculates that Macias's diagnosis of schizophrenia suggests that she hallucinated his sexual harassment. This evidence-free speculation is not only groundless, but also underscores the importance of Rule 404(b) and 415 evidence in this action. The testimony of Rich regarding her experiences with Lange is evidence of Lange's pattern of harassment – that it is not the product of mistake (or hallucination), but undertaken with knowledge and intent, further corroborating Macias's experience. Finally, the assertion that Lange's harassment in the course of Macias's role as an employee, not a tenant, presents, at best for Lange, a question for trial. As set forth above, Lange made clear that Macias was required to clean for him as part of their landlord-tenant relationship or else face eviction – clearly triggering the fair housing laws including Civil Code § 51.9 prohibiting sexual harassment by landlords. (Macias Depo. p. 106:5-21; 264:9-25; 266:2-15; 267:8-20.) The totality of the circumstances in this case, viewed from the perspective of a reasonable woman in Macias's position and from Macias's own perspective, shows that Lange sexually harassed Macias in violation of fair housing laws. Accordingly, his motion should be denied.

***2. Summary judgment must be denied on Cynthia Rich's sexual harassment claims.***

Plaintiff Cynthia Rich seeks to prove sexual harassment based on a hostile environment. As a defense to Rich's allegations, Lange argues that his behavior is not "severe or pervasive" enough to establish a hostile environment as a matter of law. In support, Lange's counsel states that "Mr. Lange has an awkward," "off-putting personality" (ECF Doc. 46-1 pp. 4-5), and that Rich's complaints are "mundane." Lange trivializes Rich's experiences to an "awkward conversation with an old man who is not what many would consider 'politically correct.'" (ECF Doc. 46-1 pp.9-10). But viewed from the perspective of a reasonable woman in Rich's position, the totality of the circumstances in this case show that Lange

created a hostile environment for Rich.

Proof of a hostile or abusive environment has both subjective and objective elements: the victim must perceive the environment as abusive, and the environment must be one that a reasonable person woman would find hostile or abusive. *Harris*, 510 U.S. at 21; *Ellison*, 924 F.2d at 879. Here, there is no doubt that Rich herself viewed the environment as hostile and that it negatively altered the conditions of her housing. For example, as set forth above, Rich testified, *inter alia*, that Lange was continuously on the property she and her husband rented, that she tried to stay inside to avoid interactions with Lange, keeping her drapes closed, but that she had to go outside when he was on the property to ask what he wanted or to keep her dogs from biting him, that he had tried to hug her twice, that she would try to get away from him, but that he would not let her go, getting rude when she attempted to disengage, such that she felt that her tenancy was in jeopardy if she did not continue to interact with him, and that he had told her, when he changed her locks, that he could come in and out of her house anytime he wanted. (Rich Depo. 65:24-66:8; 86:5-11; 161:14-16; 104:14-24; 107:6-7, 136:19-137:5, 153:14-18; 212:16-21, 206:17-207:9; 208:9-11; 157:15-19.) These facts also are sufficient to present an issue for trial.

Viewed in their totality and in the light most favorable to plaintiff, these fact are sufficient for a rational trier of fact to find that the harassment suffered by Rich was sufficiently severe or pervasive that a reasonable woman would find it to have interfered with her enjoyment of her housing, negatively affecting the conditions of her tenancy. Rich's statement in her deposition that she was not "discriminated against" by Lange is irrelevant – she testified that she was sexually harassed which is a type of sex discrimination. (Rich Depo. 255:1-256:1.) That Rich never sought a restraining order or made a formal complaint prior to being contacted by attorneys from the Legal Aid Society of San Diego in the course of their investigation of Lange's reported sexual harassment does not suggest a different

result. Nor does the fact that she hid the sexual harassment from her husband for fear of his upset.

Finally, the testimony of co-plaintiff Erika Macias regarding her experiences with Lange is evidence of Lange's pattern of harassment – that it is not the product of mistake, but undertaken with knowledge and intent – and highly relevant in assessing Rich's experience. Fed. R. Evid. 404(b), 415. Testimony by other victims of Lange's sexual harassment is admissible under Fed. R. Evid. 404(b) to show his motive, intent and lack of mistake. *Heyne v. Caruso*, 69 F.3d 1475, 1480 (9th Cir. 1995); *see also* Fed. R. Evid. 415 (admitting similar evidence to show propensity to sexually harass.) Indeed, the probative value of an employer's sexual harassment of other female employees is especially high "because of the inherent difficulty of proving state of mind." *Id.* (internal quotations omitted). *See also Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1286 (11th Cir. 2008) (evidence of discrimination against other employees admissible under FRE 404(b) to prove the intent of the employer to discriminate and retaliate). The testimony of Macias that she had been subject to sexual harassment and had told Lange it was not appropriate raises the inference that Lange *knew* that his conduct was unwanted and upsetting to Rich.

This evidence presents a genuine issue of material fact that precludes summary judgment on Rich's hostile environment claims under the FHA, FEHA, Unruh Act and § 51.9.

***3. Summary judgment must be denied on plaintiffs' Ralph Act claims.***

The Ralph Act, California Civil Code § 51.7, protects persons from "any violence, *or intimidation by threat of violence*, committed against their persons" because of sex. Civ. Code § 51.7 (emphasis added). The test for whether a threat of violence is intimidating within the meaning of Civil Code § 51.7 is "would a reasonable person, standing in the shoes of the plaintiff, have been intimidated by

the actions of [Lange] and have perceived a threat of violence?" *Winarto v. Toshiba America Electronics Components, Inc.*, 274 F.3d 1276, 1289-1290 (9th Cir. 2001) (internal citation omitted). An implicit threat of violence can serve as the threat of violence necessary to establish a violation of the Ralph Act. In *Zamora v. Sacramento Rendering Co.*, 2007 WL 137239 * 1 (E.D. Cal. Jan. 17, 2007), the district court found a triable issue of fact precluding summary judgment in a sexual harassment case where the plaintiff alleged a violation of the Ralph Act based on conduct by her supervisor, the most threatening of which was trying to kiss her while they were alone in a room and putting his arm across the doorway as if to block her exit. In that case, although the supervisor had never verbally threatened the plaintiff, the court found a triable issue as to whether a reasonable woman in the plaintiff's position would have perceived a threat of violence when her supervisor allegedly barred the trailer door with his arm, although he did not touch her or attempt to detain her. *Id.* at * 7.

In this case, Lange's statement to Rich, while he changed the locks on her door, that he could come in and out of her house anytime he wanted, and that she could not change her locks, implied a threat of violence to her person. (Rich Depo. 86:5-11; 87:15-24). With respect to Macias, the threat of violence was even more palpable. Lange had previously locked Macias inside his house with him and grabbed her. When she went to pay her June rent after Lange had demanded sex, she was afraid of him, given the escalation in his sexual misconduct. Even Lange recognized Macias's fear, stating, "Don't worry. I'm not going to do anything." (Macias Depo. 68:9-20; 87:16-20) Macias had good reason to fear Lange's implicit threat of violence. The motion should be denied.

***4. Summary judgment must be denied on plaintiffs' quiet enjoyment claims.***

Plaintiff Rich asserts a claim for breach of her right to the quiet use, enjoyment and possession of her dwelling in violation of California Civil Code §

1927. California Civil Code § 1927 provides that "[a]n agreement to let upon hire binds the letter to secure to the hirer the quiet possession of the thing hired during the term of the hiring, against all persons lawfully claiming the same." Every lease contains an implied covenant of quiet enjoyment, whereby the landlord impliedly covenants that the tenant shall have quiet enjoyment and possession of the premises. *Andrews v. Mobile Aire Estates*, 125 Cal. App. 4th 578, 588 (2005). To be actionable, the landlord's act or omission must substantially interfere with a tenant's right to use and enjoy the premises for the purposes contemplated by the tenancy. *Id.*, 125 Cal. App. 4th at 589.

While a claim for constructive eviction may require that the tenant abandon the premises, a tenant need not surrender possession of the premises to state a claim for breach of the covenant of quiet enjoyment. The tenant may elect to stand on the lease, remain in possession and sue for breach of contract damages. *Id.*, 125 Cal. App. 4th at 590. Rich remains a tenant. The facts presented concerning Lange's continued intrusion on Rich's property and his unwelcome and harassing conduct present genuine issues of material fact whether Lange's conduct breached Rich's right to quiet use, enjoyment and possession of her dwelling. *See Hickman*, 974 F. Supp. 2d at 1294 (denying summary judgment on quiet enjoyment claim in fair housing sexual harassment case where the plaintiff remained a tenant). Similarly, Lange's insistence on making receipt of sexual favors from Macias a condition of her continued tenancy deprived Macias of her quiet enjoyment of her dwelling. Accordingly, defendant's motion must be denied.

***5. Summary judgment must be denied on plaintiffs' claims for invasion of privacy.***

Under California law, the tort of invasion of privacy includes intrusion on the plaintiff's physical solitude or seclusion. *Porten v. University of San Francsico*, 64 Cal.App.3d 825, 841 (1976). A privacy violation based on the common law tort of intrusion has two elements. First, Lange must intentionally

intrude into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy. Second, the intrusion must occur in a manner highly offensive to a reasonable person. *Hernandez v. Hillsides, Inc.*, 47 Cal.4th 272, 286 (2009). The evidence submitted by plaintiff shows that Rich had an expectation of privacy in her property that Lange repeatedly violated, and that the intrusion was highly offensive for the same reasons it constituted a hostile environment. Similarly, Lange demanded that Macias forfeit control over her most intimate decision which invaded her right to privacy; specifically, the freedom to decide with whom Macias shared an intimate, sexual relationship. Accordingly, defendant's motion should be denied.

## V. CONCLUSION

For the foregoing reasons, plaintiff requests that the Court deny defendant's motions for summary judgment in their entirety.

Dated: February 19, 2016.

Respectfully submitted,

LEGAL AID SOCIETY OF SAN DIEGO
Branden G. Butler
Rosalina Spencer
Legal Aid Society of San Diego
1764 San Diego Avenue, Suite 200
San Diego, CA 92110
brandenb@lassd.org
rosalinas@lassd.org

BRANCART & BRANCART

*/s/ Christopher Brancart*

Christopher Brancart
cbrancart@brancart.com

Attorneys for Plaintiffs

# CERTIFICATE OF SERVICE

Pursuant to Rule 5 of the Federal Rules of Civil Procedure, on February 19, 2016, I served by email a copy of the attached document – **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTIONS FOR SUMMARY JUDGMENT [ECF 46 and 47]**– upon the following attorneys:

Branden G. Butler
Legal Aid Society of San Diego
1764 San Diego Avenue, Suite 200
San Diego, CA 92110
brandenb@lassd.org

Seth Bobroff
Law Offices of Seth B. Bobroff
9449 Balboa Ave., Suite 301
San Diego, CA 92123
Fax: (619) 452-2801
sbobroff@sbbesq.com

*/s/ Christopher Brancart*