1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10

ERIKA MACIAS AND CYNTHIA
RICH,

Plaintiffs,

v.

MYRON LANGE,

Defendant.

CASE NO. 14cv2763-GPC(JMA)

**ORDER DENYING DEFENDANT'S
MOTION FOR SUMMARY
JUDGMENT AS TO PLAINTIFF
MACIAS AND GRANTING IN
PART AND DENYING IN PART
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AS TO
PLAINTIFF RICH**

[Dkt. Nos. 46, 47.]

11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Before the Court are Defendant's motion for summary judgment as to Plaintiff Macias and Defendant's motion for summary judgment as to Plaintiff Rich's allegations of sexual harassment while they were tenants at Defendant's properties. Plaintiffs filed an opposition on February 19, 2016. (Dkt. No. 49.) Defendant filed replies on March 4, 2016. (Dkt. Nos. 56, 57.) A hearing was held on March 25, 2016. (Dkt. No. 61.) Christopher Brancart, Esq., Branden Buter, Esq. and Rosaline Spencer, Esq. appeared on behalf of Plaintiffs, and Seth Bobroff, Esq. appeared on behalf of Defendant. Based on the briefs, the supporting documentation, the applicable law, and arguments raised at oral argument, the Court DENIES Defendant's motion for summary judgment as to Plaintiff Macias, and GRANTS in part and DENIES in part Defendant's motion for summary judgment as to Plaintiff Rich.

////

**Factual Background**

On November 19, 2014, Plaintiffs Erika Macias ("Macias") and Cynthia Rich ("Rich") filed a complaint against Defendant Myron Lange ("Defendant") for violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, *et seq*.; California Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code sections 12927, 12955, *et seq*.; California Civil Code section 51.9 ("section 51.9"); California Ralph Act, ("Ralph Act"), Cal. Civ. Code section 51.7; California Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code section 51; breach of the covenant of quiet use and enjoyment; and invasion of privacy. (Dkt. No. 1, Compl.)   Defendant is the owner of about eight rental houses and apartments in the San Diego area.  After retiring from the Navy in 1980, he obtained his real estate license and has been self-employed since then. Macias was a tenant of Defendant from 2001 until the end of 2013, and Rich has been a tenant of Defendant since 2011.

**A.    Facts as to Plaintiff Macias[1]**

Plaintiff Macias and her family, which included four children[2], rented a dwelling

---

[1]Defendant argues that the Court should take into account Macias' credibility because she presents allegations in the complaint that contradict her deposition testimony. (Dkt. No. 47-1 at 10.) However, the discrepancies noted by Defendant are not "clear and unambiguous" but are "minor inconsistencies that result from an honest discrepancy, a mistake . . . ." Van Asdale v. Int'l Game Tech., 577 F.3d 989, 999 (9th Cir. 2009) (addressing contradiction between deposition testimony and subsequent affidavit). Here, the Court does not see any factual contradiction in paragraph 7 of the complaint compared with Macias' deposition testimony. As to paragraph 8 of the complaint, Macias alleged that Defendant grabbed her buttocks but at her deposition, she stated that he patted or brushed her buttocks. The Court concludes the inconsistency is a minor one. Lastly, the allegation in paragraph 10 that Defendant followed her out the door is supported by the deposition transcript. At her deposition, Macias stated that Defendant followed her out to the car to see if Macias would introduce him to her sister-in-law, (Dkt. No. 47-5, Bobroff Decl, Ex. 2, Macias Depo. at 67:21-22; 59:14-16).  The only inconsistency in paragraph 10 is that the complaint alleges after the "blow job" comment, Defendant said, "Can I at least see your nipple and kiss your breast" compared to her deposition testimony where she testified that he came close, tried to kiss her and asked her for a kiss.  The Court again concludes that this inconsistency is minor and does not constitute a contradiction sufficient to raise doubt as to its plausibility.  See Rojas v. Roman Catholic Diocese of Rochester, 660 F.3d 98, 105-06 (2d Cir. 2011).

[2]Macias' husband also lived at the house until around 2006 when he left.

located on 751 Jewell Drive owned by Defendant in 2001 until 2014[3] after the property was sold. (Dkt. No. 47-5, Bobroff Decl., Ex. 2, Macias Depo. at 29:21-30:4; 48:23-25; 49:1-50:7; 175:17-19.)  Rent was due on the 10th of the month, and since Defendant only wanted cash for rent payment, she would bring the rent payments to his house. (Dkt. No. 52-1, Brancart Decl., Ex. 1, Macias Depo. at 91:6-8; 122:11-12;134:17-20; 135:15-19.)

The sexual harassment by Defendant began sometime after 2006 or 2007 when Plaintiff's husband left.  (Id. at 90:23-91:9; 92:6-12; 93:12-18.)  The first incident occurred when Defendant lived at the Lemon Grove property and she brought him the rent payment.  (Id. at 90:25-91:11.)  When she was inside Defendant's house, he said "hold on," and then locked the front and back doors.  (Id.)  He then approached her, grabbed her around her waist, and told her that she had beautiful breasts and asked whether he could kiss her.  (Id. at 91:13-15.)  Plaintiff pushed him away and said, "Look, Mr. Lange. I'm going to pretend this isn't happening. Let's sit down . . . and do what I'm here for" which was to pay rent.  (Id. at 91:16-20.)  Defendant backed off because he knew she was not happy.  (Id. at 91:21-22.)  She stated she was really scared and shaking.  (Id. at 90:25-91:2; 91:21-23.)  She told Defendant that her brother and boyfriend were outside waiting.  (Id. at 91:24-25.)  After she told him she was there to pay rent, she got up and walked out.  (Id. at 92:3-5.)  After that first incident, she called Rito Chavez, Defendant's handyman.  (Id. at 93:6-11.)  She was crying and told him what happened.  (Id. at 93:6-11.)  Since she did not want to be alone with Defendant, she asked Chavez to let her know what day he would be at the properties since Defendant had asked Macias to clean his properties.  (Id. at 93:6-11.)

Around 2006 or 2007, Plaintiff also stopped working at her job with the city schools and she started being late on her rent payments.  (Id. at 92:6-12; 93:14-18; 94:2-8; 94:21-24; 263:22-25.)  Therefore, Defendant offered her a job cleaning his

---

[3] Although not specifically presented by the parties, it appears the Defendant sold the property at the end of 2013 and Macias remained at the property with the new owner for a couple of months until February 2014.

1  properties to assist in paying the rent on time.  (Id.)  Whenever Macias cleaned,
2  Defendant was always present.  (Id. at 94:25-95:5.)  He would sit on the couch with a
3  shot of tequila, and they would talk while she cleaned and he would tell her where to
4  clean.  (Id. at 101:22-102:2; 102:21-103:6.)  He made comments about how she looked
5  good on her knees, and asked to see her breasts.  (Id. at 100:13-17; 101:17-19).
6  Another time, she would clean around the couches and he said "ooh, let me see those
7  beautiful breasts again."  (Id. at 107:16-22.)  She tried to ignore his comments and
8  blow it off because as a low-income single mother with a large family, she could not
9  afford to move and was afraid of being evicted.  (Id. at 104:4-17.)  She cleaned his
10 properties more than ten times.  (Id. at 94:11-20.)

11     Defendant also asked her to marry him, to leave her children with her mother and
12 move in with him.  (Id. at 62:22-25.)  On several occasions, he asked if he could kiss
13 her.  (Id. at 63:12-17.)  He would comment about her breasts every couple or every few
14 months when she went to pay rent,.  (Id. at 122:4-22.)  On most occasions, she would
15 say something like "Mr. Lange, don't do that" or "Don't say that."  (Id. at 122:23-
16 123:4.) When she cleaned, he asked to see her breasts about three times.  (Id. at 98:9-
17 13; 107:10-13; 108:17-22.)  He commented that she had beautiful breasts more than ten
18 times.  (Id. at 120:9-20.)  On a few occasions, he stated she had a thick body.  (Id. at
19 124:17-19.)  He also told Macias she was "hard to resist" while she was working for
20 him.  (Dkt. No. 51, SSUF, No. 36.)  But he also made appropriate comments that she
21 looked nice or that she doing a good job cleaning.  (Dkt. No. 47-5, Bobroff Decl., Ex.
22 2, Macias Depo. at 123:5-13.)

23     Defendant paid Macias $10 per hour on the day she cleaned his Menlo property.
24 (Dkt. No. 52-1, Brancart Decl., Ex. 1, Macias Depo. at 102:3-11.)  However, at times,
25 when she could not pay her rent on time, he would not pay her for cleaning.  (Id. at
26 104:22-105:5.)  While she testified she was working for him separate and apart from
27 the rental agreement, (Id. at 104:19-21), if she didn't want to clean he would comment,
28 "oh, you don't want to work, you must not want to live here" or "you must not want to,

1   you know, make money to pay your rent." (Id. at 106:5-13; 14-21.)   Since his

2   comments always alluded to eviction, she was afraid of being evicted. (Id. at 105:24-

3   106:1; 106:14-21.)  On another occasion when she cleaned the Menlo condo, she was

4   not paid because he told her to take it off the late fee.   (Id. at 107:10-108:10.)

5        In order to avoid being alone with Defendant, Macias brought one of her teenage

6   daughters with her as often as possible. (Id. at 114:23-115:4.)   But the sexual

7   harassment did not stop. (Id. at 109:11-20; 112:10.)  One time, Defendant walked by

8   Macias while she was cleaning and patted her butt while her high school daughter was

9   present. (Id. at 111:15-112:5.)  On another time, her daughter saw Defendant brush his

10  elbow against Macias' breast.  (Id. at 113:17-23.)   Her other daughter was present

11  during two additional incidents when Defendant bumped her breast and butt.  (Id. at

12  115:22-116:9.)  When he bumped his elbow on her breast, he said "oops" so Macias

13  testified that it could have been an accident. (Id. at 114:7-18.)  She would clean about

14  once a month and spent about three hours cleaning. (Id. at 116:18-25.)

15       Macias testified that she responded to all the incidents by asking him to stop and

16  to respect her but he would just laugh or say she was hard to resist.  (Id. at 118:6-21.)

17  He never touched her at her property.  (Id. at 118:22-24.)

18        Macias had a history of being late in paying her rent to Defendant.  (Dkt. No.

19  51, SSUF, No. 3.)  Defendant would not charge a late fee when she was late paying rent

20  but would sometimes say, "just work it off."  (Dkt. No. 47-5, Bobroff Decl., Ex. 2,

21  Macias Depo. at 108:6-16.)

22       On June 10, 2013, Macias called Defendant and asked for a short extension of

23  time to pay June's rent.   (Brancart Decl., Ex. 1, Macias Depo. at 60:20-61:8.)

24  Defendant said it was fine as long as it was paid on June 24, 2013. (Id. at 61:3-5.)  On

25  June 24, 2013, Macias went to Defendant's house, because Defendant did not answer

26  his phone, to request an additional extension to pay her June rent because her boyfriend

27  had been arrested. (Id. at 52:4-10; 61:9-14.)  Defendant invited her in and offered her

28  a shot of tequila as he was about to have a shot of tequila.  (Id. at 64:5-17.)  She

responded "sure" and he gave her a shot of tequila. (Id. at 64:15-21.) They conversed for a few minutes and then Macias told him she was there to talk about the rent and said "I really need a big favor from you." (Id. at 64:15-18.) He responded, "I'll do a favor if you do me a favor." (Id. at 56:2-4.) Then he said, "What I'd really like is a good blow job." (Id. at 66:14-20.) Then he came close to Macias' face, tried to kiss her and said something like, "just let me kiss you." (Id. at 82:2-14.) Defendant was close enough that she felt his breath on her face. (Id. at 90:16-18.) On that day, he also asked her for a kiss. (Id. at 81:20-21:1.) Macias backed up with a nervous giggle questioning why he was doing that since they were in a tenant relationship. (Id. at 66:21-67:2) Defendant told Macias it was because she was hard to resist. (Id. at 67:3-5.) Then she said, "I have to go. I got to go, Mr. Lange. I'm going to pretend this didn't happen." (Id. at 67:6-8.)

Then Defendant asked something like "how about you get me somebody to help me out?" (Id. at 67:9-11.) He asked Macias who she was with and she responded it was her sister-in-law who was young and married. (Id. at 67:9-20.) He said "oh, it's okay" and followed her out to see who was in the car and if Macias would introduce him. (Id. at 67:21-22; 59:14-16.) Then Macias got in her car and took off. (Id. at 67:23-25.) She testified that Defendant could tell she was upset and really scared. (Id. at 67:23-25; 82:15-17.) She stated she was devastated, went home crying, and believed she would be evicted because she did not give him a blow job. (Id. at 80:16-81:2.) Shortly after the blow job incident, Macias hired an attorney who sent a letter to Defendant complaining of his sexual harassments. (Id. at 78:15-79:16.) After she refused to give a blow job to Defendant, he provided different reasons why he was going to evict her, such as not paying for July's rent or because she did not fix the bathroom fixtures. (Id. at 217:10-17.)

During the June 24, 2013 conversation, Defendant told Macias that if she paid the rent and fixed the bathroom fixtures then he would not sell the property and would allow her to live there. (Id. at 53:6-12; 59:17-23.) Defendant said the agreement when

[14cv2763-GPC(JMA)]

1  she first moved in was for "[her] to do all fixtures on the property" which she denies.

2  (Id. at 53:13-54:1.)

3      Around July 4, 2013, Macias brought her full June rent of $1,300 to Defendant's

4  house. (Id. at 52:17-53:2; 87:9-11.) On that day, she would not go inside Defendant's

5  house. (Id. at 68:1-4.) Defendant stated, "Don't worry. I'm not going to do anything

6  to you." (Id. at 68:6-8.) She did not believe him and was frightened since he had

7  previously locked her in his house, and made the conditional "blow job" request. (Id.

8  at 68:11-20.) She said "It's okay. I'm just here to give you the rent for June." (Id. at

9  68:9-10.) On this visit, Defendant commented about selling the property, and she

10  screamed at him saying "Why are you doing this? You're doing this because I wouldn't

11  give you an . . . f–ing blow job." (Id. at 69:5-13.) He started laughing and said it was

12  not about that but because the rent was not paid when she said the rent had been paid,

13  and because of her failure to fix the bathroom fixtures. (Id. at 69:13-22.) Macias

14  testified that this conversation may have occurred on July 10. (Id. at 71:10-72:4.) On

15  July 10, 2013, she went to Defendant's house and paid July's rent of $900. (Id. at

16  54:16-25.) She withheld the full amount because she did not have full use of the

17  bathroom. (Id. at 55:1-10.) On that day, Defendant gave her a three day notice to quit.

18  (Id. at 72:1-7; Dkt. No. 47-5, Bobroff Decl., Ex. 2, Macias Depo. at 77:23-78:14.) She

19  cried and told him how he harassed her for years and how she put up with stuff from

20  him. (Dkt. No. 52-1, Brancart Decl., Ex. 1, Macias Depo. at 72:12-17.) She did not

21  pay rent in August, September or October 2013 because he told her he was selling the

22  property and she had to move out. (Id. at 55:12-19; Dkt. No. 51, SSUF, No. 4.)

23      After June 24 and prior to July 10th, Defendant asked Macias to give him a ride

24  to the Del Mar Fair because he needed to make a purchase and he could not drive

25  himself. (Dkt. No. 52-2, Brancart Decl., Ex. 1, Macias Depo. at 82:23-83:6.)

26  Defendant told her not to worry since it was going to be a professional ride. (Id. at

27  83:17-21.) She did not believe him but she was afraid she would be evicted if she did

28  not drive him. (Id. at 83:22-24.) They spent several hours there even though it was

[14cv2763-GPC(JMA)]

1   supposed to be one hour. (Id. at 84:15-17.) Nothing inappropriate happened at the fair.

2   (Dkt. No. 47-5, Bobroff Decl., Ex. 2, Macias Depo. at 85:17-86:4.) He bought her

3   ticket and he offered to share a muffin with her. (Id. at 85:2-9.)

4        Between June 24 and July 10, Macias also asked Defendant to write her a "fake"

5   three-day notice that she could use to get an advance from the welfare office to get

6   assistance for the July rent. (Id. at 73:8-13; 139:3-10.) They were sitting in

7   Defendant's car alone when they wrote up the notice together. (Id. at 139:1-2; 141:13-

8   16.) He also offered to provide a 30 day notice to see which one worked. (Id. at 75:13-

9   18.) However, Macias was not eligible for the assistance. (Dkt. No. 52-1, Brancart

10  Decl., Ex. 1, Macias Depo. at 140:20-25.)

11       When Macias was cleaning Defendant's home, he would be drinking shots of

12  tequila and on two or three occasions she had a drink with him at his house. (Dkt. No.

13  47-5, Bobroff Decl., Ex. 2, Macias Depo. at 102:25-103:23.) They also had a drink

14  when they would do karaoke. (Id. at 103:24-104:3.) Defendant began fixing the Jewel

15  property in July 2013. (Dkt. No. 51, SSUF, No. 43.) Macias has had memory

16  problems during the time period 2006-2014 because she was on 15 medications for

17  diagnosis including RDS, schizophrenia, depression and anxiety. (Id., No. 50.)

18       Macias complained to Rito Chavez, Defendant's handyman. (Dkt. No. 52-3,

19  Brancraft Decl., Ex. 2, Chavez Depo. at 37.[4]) Chavez stated that Macias complained

20  about Defendant's sexual harassment on three separate occasions which included

21  grabbing her buttocks. (Id. at 76-79; 87-89.) Macias was visibly upset when she told

22  Chavez about Defendant's conduct. (Id. at 78:13-15.) She also told Chavez that she

23  did not want to be alone with him. (Id. at 88:9-12.)

24        An unlawful detainer action[5] was filed by Defendant but the record is not clear

25

26       [4]Plaintiff also cites to pages 30 and 38 of Chavez' deposition; however those
27  pages are not in the record, but the Court assumes the fact that Chavez is Defendant's
    maintenance man is not disputed since he does not dispute this fact.

28       [5]In the reply brief, Defendant, without citation to the record, states the unlawful
    detainer action was filed in October 2013.

as to when and the result of the court action.  (Dkt. No. 47-5, Bobroff Decl., Ex. 2, Macias Depo. at 78:15-79:4.)  At the motion hearing, it was stated that the unlawful detainer action was dismissed in state court and she was not evicted.  After the property was sold, she communicated with the new owner and Macias elected to leave to avoid the court process of eviction.  (Id. at 49:1-50:24.)

**B.      Facts as to Plaintiff Rich**

Rich and her husband have been tenants of Defendant's property from November 3, 2011 through at least October 14, 2015 when Rich's deposition was taken.  (Dkt. No. 50, SSUF, No. 1.)  Prior to renting Defendant's property at 2229 Bonita Street, in Lemon Grove, California, Rich and her husband were given a tour of the property by the current tenant.  (Id., No. 2.)  After touring the property, they signed the lease.  Rich first met Defendant at the walk-through after she signed the lease but before moving in.  (Dkt. No. 52-2, Brancart Decl., Ex. 2, Rich Depo. at 32:17-33:10.)  During the walk through, Defendant told Rich that he owned the lot behind the house but she did not know what it was used for.  (Id. at 34:2-7.)  The back lot was only accessible by going through the gates adjacent to the house.  (Dkt. No. 46-6, Bobroff Decl., Ex. 3, Rich Depo. at 36:18-37:2; 56:17-22; 223:12-17; 227:20-228:11.) Defendant kept fruit tress, equipment, a trailer, and occasionally animals such as chickens, ducks or dogs on the back property.  (Dkt. No. 50, SSUF, No. 4.)  After moving in, Rich became aware of a non-operational utility truck outside the house, and later learned it was owned by Defendant.  (Dkt. No. 46-6, Bobroff Decl., Ex. 3, Rich Depo. at 96:7-25.)  Defendant wanted the rent check placed in the truck and Plaintiff complied.  (Id. at 97:1-13.)

The sexual harassment began from the time she moved in until November 2014, when the instant lawsuit was filed.  (Dkt. No. 52-2, Brancart Decl., Ex. 2, Rich Depo. at 52:1-10; 65:24-66:2.)  Defendant continuously came to the property unannounced.  (Id. at 53:1-7.)  He showed up many times, on any day, at any time without notice and was in the front yard, side yard, backyard, and pool area.  (Id. at 53:1-54:2.)  But the instances complained of never occurred when it was dark outside.  (Dkt. No. 50, SSUF,

[14cv2763-GPC(JMA)]

1    No. 10.)

2         Between November 2011 and March 2014, Plaintiff alleges 10-20 interactions

3    with Defendant.  (Id., No. 7.)  During more than ten of these encounters, Rich's

4    husband was at home. (Dkt. No. 52-2, Brancart Decl., Ex. 2, Rich Depo. at 70:12-23.)

5    On most of these occasions, Rich would notice Defendant in front of her house, then

6    Rich would go outside and converse with Defendant.  (Dkt. No. 46-6, Bobroff Decl.,

7    Ex. 3, Rich Depo. at 71:3-15.)  She explained she would go outside because her dogs

8    would be barking and she did not want Defendant to get bit.  (Id. at 71:3-9; 101:11-14;

9    104:14-24.)  She also came out when she saw him to make sure he got the $1650 rent

10   check because she had concerns about putting it in an empty, unlocked truck.  (Id. at

11   100:18-24.)

12        Rich's husband went outside on a few occasions.  (Id. at 71:16-20.)  While Rich

13   and her husband had concerns about Defendant appearing at their house without notice,

14   her husband did not address the issue to Defendant because he does not like talking to

15   people.  (Id. at 73:4-11.)  Unlike her husband, Rich enjoys talking to people.  (Id.)

16        Sometimes, Defendant arrived when Rich was on her way to work or was

17   working outside in the yard.  (Dkt. No. 52-2, Brancart Decl., Ex. 2, Rich Depo. at

18   160:24-161:5.)  She testified that when Defendant was on or near the property, he was

19   accessing his back lot, trimming bushes, retrieving the rent check from the truck or

20   working on the truck.  (Dkt. No. 46-6, Bobroff Decl., Ex. 3, Rich Depo. at 95:6-96:25;

21   97:1-8; 103:18-104:4.)  At times, when she asked him what he was doing on the

22   property and asked if he could give them notice, he said it was his property.  (Id. at

23   54:15-56:4;  99:22-25.)

24        During his unannounced visits, Defendant would engage in inappropriate

25   behavior, make inappropriate  comments, make inappropriate eye contact and hand

26   gestures, and engage Plaintiff in unsolicited communications about his personal life.

27   (Dkt. No. 52-2, Brancart Decl., Ex. 2, Rich Depo. at 45:16-19; 64:12-65:5.)  Rich

28   stated that the inappropriate behavior consisted of his mannerisms and the inflection

of his voice. (Id. at 63:24-25.) He made inappropriate comments that if she was not married, he would be there first to approach her. (Id. at 65:2-3.) He also said that Rich was a good looking woman who should be aware of the way she looked and dressed because she was sexy. (Id. at 65:3-5.) As for inappropriate mannerisms, while they were talking, Defendant would adjust his pants, with his hands in his pockets, jiggling coins, and be in close contact to her. (Id. at 65:15-19; 74:2-20.) It was uncomfortable talking to him while his hands were in his groin area. (Id. at 75:15-23.) Rich remembers the first time Defendant told her she dressed sexy, he was shirtless and trimming bushes in the backyard. (Id. at 103:11-24.) At other times, he took his shirt off and talked about his sexual behavior. (Id. at 141:4-5.) As she tried to move away from him, he would move towards her and flex his arms saying "Look at me. Look at my body. Look at my arms." (Id. at 141:13-22.) She also complained about his eye movements with his eyebrows going up and down like "winky-winky" kind of gestures. (Id. at 65:20-23.) He was very flirtatious. (Id. at 136:5-16.) She never told Defendant or her husband about the gestures Defendant made, and how he jiggled coins in his pockets and adjusted his pants. (Id. at 75:24-76:8.)

He commented on her dress attire, her looks and appearance. (Id. at 64:12-14.) He told her that she dressed sexy between 20 to 30 times. (Id. at 102:23-103:10.) He told her "you're really hot." (Id. at 149:22-25.) These comments occurred all the time. (Id. at 89:22-25.)

He would also engage her in conversations about his personal life such as telling her he went out partying the night before, how he picked up some women with his friends, and how he drank all night, not remembering parts of the night. (Id. at 105:10-19.) In that conversation, she did not interact at all but listened because she was being polite. (Dkt. No. 46-6, Bobroff Decl., Ex. 3, Rich Depo. at 106:20-107:13.) Eventually, her husband called her into the house. (Id. at 107:14-20.) He also told her how he slept with women. (Id. at 109:2-11.) He would ask Rich to hook him up with a "hot Latina" like her. (Dkt. No. 52-2, Brancart Decl., Ex. 2, Rich Depo. at 151:10-

14.)  He would ask her if she had any dateable friends.  (Id. at 64:1-5.)  He asked her if she wanted to go to a local tavern to see him perform.  (Id. at 64:6-11.)  He also tried to hug Rich a couple of times.  (Id. at 153:14-18.)

She felt obligated to interact with him in order to continue her tenancy.  (Id. at 208:9-11.)  She tried to disengage with him but she didn't know how.  (Id. at 212:19-21.)  She would try to leave but he would start another conversation.  (Id. at 107:6-7.)  If he was coming on to her, she would try to deflect the conversation and his tone would change.  (Id. at 136:10-137:22.)  If she disengaged from the conversation and left, Defendant did not try to keep her.  (Id. at 140:14-21.)

As a result, she tried to stay in the house as much as possible to avoid Defendant.  (Id. at 159:23-160:16.)  However, it was difficult to stay in the house because the dogs would bark, if they were inside, or go after him, if they were outside.  (Id.)  She kept the drapes closed because of Defendant.  (Id. at 157:15-19.)  There were a couple of times when she stayed in the house and hid while waiting for Defendant to leave.  (Id. at 166:20-23.)

She became fearful for her safety when Defendant said he was going to change her locks, and stated that he could come in and out of her house anytime he wanted to.  (Id. at 86:5-11.)  She does not recall when this comment was made, whether it was in 2011 or 2014.  (Id. at 86:9-19; Dkt. No. 46-6, Bobroff Decl., Ex. 3, Rich Depo. at 88:6-11.)  Defendant told her she could not change the locks.  (Dkt. No. 52-2, Brancart Decl., Ex. 2, Rich Depo at 87:15-24.)  Defendant changed the locks on the security door and the front door of the house, and she got new keys.  (Dkt. No. 46-6, Bobroff Decl., Ex. 3, Rich Depo. at 88:1, 18-19.)

She never told her husband about Defendant's sexual remarks or conduct because she was afraid of his reaction.  (Dkt. No. 52-2, Brancart Decl., Ex. 2, Rich Depo. at 49:22-50:8.)  Defendant never solicited sex from Rich, never kissed Rich, and never touched her inappropriately.  (Dkt. No. 50, SSUF, Nos. 13, 14, 15.)  She stated that he never asked her to have any sort of relationship with her.  (Dkt. No. 46-6,

[14cv2763-GPC(JMA)]

Bobroff Decl., Ex. 3, Rich Depo. at 128:18-20.)  But Defendant told Rich that if she needed a new husband, he would be available.  (Id. at 89:11-15.)  Defendant told Rich that he wished he could wake up next to her.  (Dkt. No. 52-2, Brancart Decl., Ex. 2, Rich Depo. at 147:22-148:4.)

When Rich first moved in, she invited Lange to attend a Padres baseball game with her husband and friends, but Lange declined.  (Dkt. No. 46-6, Bobroff Decl., Ex. 3, Rich Depo. at 128:23-129:11.)  When Lange invited Rich and her husband to his church, they felt obligated to attend and went two times.  (Id. at 250:2-21.)

## Discussion

### A.    Legal Standard on Motion for Summary Judgment

Federal Rule of Civil Procedure 56 empowers the Court to enter summary judgment on factually unsupported claims or defenses, and thereby "secure the just, speedy and inexpensive determination of every action."  Celotex Corp. v. Catrett, 477 U.S. 317, 325, 327 (1986).  Summary judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is material when it affects the outcome of the case.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of demonstrating the absence of any genuine issues of material fact.  Celotex Corp., 477 U.S. at 323.  The moving party can satisfy this burden by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element of his or her claim on which that party will bear the burden of proof at trial.  Id. at 322-23.  If the moving party fails to bear the initial burden, summary judgment must be denied and the court need not consider the nonmoving party's evidence.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 159-60 (1970).

Once the moving party has satisfied this burden, the nonmoving party cannot rest

on the mere allegations or denials of his pleading, but must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324.  If the non-moving party fails to make a sufficient showing of an element of its case, the moving party is entitled to judgment as a matter of law.  <u>Id.</u> at 325.  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986).  In making this determination, the court must "view[] the evidence in the light most favorable to the nonmoving party."  <u>Fontana v. Haskin</u>, 262 F.3d 871, 876 (9th Cir. 2001).  The Court does not engage in credibility determinations, weighing of evidence, or drawing of legitimate inferences from the facts; these functions are for the trier of fact.  <u>Anderson</u>, 477 U.S. at 255.

**B.     Federal Housing Act ("FHA")**

The FHA prohibits discrimination based on sex in the sale or rental of housing. 42 U.S.C. § 3604[6], 3617[7].  Sexual harassment is a form of sex discrimination that is actionable under the FHA.  <u>Salisbury v. Hickman</u>, 974 F. Supp. 2d 1282, 1290 (E.D. Cal. 2013)  (citing <u>Quigley v. Winter</u>, 598 F.3d 938, 946 (8th Cir. 2010); <u>DiCenso v. Cisneros</u>, 96 F.3d 1004, 1008 (7th Cir. 1996); <u>Honce v. Vigil</u>, 1 F.3d 1085, 1089-90 (10th Cir. 1993); <u>Shellhammer v. Lewallen</u>, 770 F.2d 167 (6th Cir. 1985); <u>Beliveau v. Caras</u>, 873 F. Supp. 1393, 1396-97 (C.D. Cal. 1995).)  The Ninth Circuit has applied Title VII discrimination analysis when examining FHA discrimination claims. <u>Gamble</u>

---

[6]"[I]t shall be unlawful . . . (b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin."  42 U.S.C. § 3604(b).

[7]"It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."  42 U.S.C. § 3617.

1  v. City of Escondido, 104 F.3d 300, 304 (9th Cir. 1997) ("Most courts applying the

2  FHA . . . have analogized it to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§

3  2000e *et seq.*, which prohibits discrimination in employment.")  A claim for sexual

4  harassment under the FHA is actionable when it creates a "'hostile housing

5  environment' or constitutes 'quid pro quo' sexual harassment.'" United States v. Hurt,

6  676 F.3d 649, 654 (8th Cir. 2012); see also Honce v. Vigil, 1 F.3d 1085, 1089 (10th

7  Cir. 1993) (courts have recognized two forms of sexual harassment: "quid pro quo"

8  harassment and "hostile housing environment" harassment).

9       Plaintiff Macias alleges sexual harassment claims based on a hostile housing

10  environment and quid pro quo.  (Dkt. No. 49 at 18.)  Plaintiff Rich alleges sexual

11  harassment based on a hostile housing environment only.  (Dkt. No. 49 at 20.)

12  Defendant moves for summary judgment on all causes of action against him.  In

13  response, Plaintiff argues there are genuine material issues of fact that preclude

14  summary judgment.

15         **1.**     **Hostile Housing Environment**

16       To succeed on a hostile housing environment claim, a tenant must show she was

17  subject to "unwelcome sexual harassment, and the harassment was sufficiently severe

18  or pervasive so as to interfere with or deprive [Plaintiff] of her right to use or enjoy her

19  home." Quigley v. Winter, 598 F.3d 938, 946-47 (8th Cir. 2010); see also Honce, 1

20  F.3d at 1090.  "[A] claim is actionable when the offensive behavior unreasonably

21  interferes with use and enjoyment of the premises." Honce, 1 F.3d at 1090.

22       One or two occasions of sexual harassment is not enough to create a hostile

23  environment. See DiCenso v. Cisneros, 96 F.3d 1004, 1008-09 (7th Cir. 2006)

24  (Landlord's harassment of tenant on one occasion, when he caressed tenant's arm and

25  back, told her that if she could not pay the rent, she could take care of it in other ways,

26  and called her names after she slammed the door in his face, does not constitute

27  actionable claims under the FHA); Shellhammer v. Lewallen, 770 F.2d 167 at *3 (6th

28  Cir. 1985) (unpublished) (affirming district court finding that two explicit sexual

propositions from a landlord during four months of tenancy did not prove a hostile housing environment because it did not create a "burdensome situation" that would make the tenancy undesirable); Honce, 1 F.3d at 1090 (no hostile housing environment where offensive behavior did not include sexual remarks or requests, physical touching or threats of violence but that landlord asked tenant to accompany him socially on three occasions, all prior to occupying the premises and other tenants of both sexes endured similar treatment); Saxton v. American Tel. & Telegraph Co., 10 F.3d 526, 528, 534 (7th Cir. 1993) (finding insufficient harassment to constitute a hostile work environment where plaintiff was rubbed and kissed on one occasion, and resisted an attempted groping on another).

Harassment that is isolated or trivial is not sufficient to state a cause of action. Honce, 1 F.3d at 1090 (citing Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 65 (1986)); Candelore v. Clark County Sanitation Dist., 975 F.2d 588, 590 (9th Cir. 1992) (per curiam) ("[I]solated incidents of sexual horseplay alleged by the plaintiff took place over a period of years and were not so egregious as to render plaintiff's work environment 'hostile.'"). "The offensive acts need not be purely sexual; it is sufficient that they would not have happened but for claimant's gender." Honce, 1 F.3d at 1090 (citing Hicks v. Gates Rubber Co., 833 F.2d 1406, 1415 (10th Cir. 1987)).

Under Title VII, a "sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." Faragher v. City of Boca Raton, 524 U.S. 775, 787 (1998); see also Hall v. Meadowood Ltd. Partnership, 7 F. App'x 687, 689 (9th Cir. 2001).

Whether "an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances, [and] may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 23 (1993). "The effect on the

employee's psychological well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." Id. Generally, "the more severe harassment, the less need to show a repetitive series of incidents." Brooks v. City of San Mateo, 229 F.3d 917, 926 (9th Cir. 2000) (citation omitted).

The harassment "must be more than episodic;" it must be "sufficiently continuous and concerted in order to be deemed pervasive." Faragher v. City of Boca Raton, 524 U.S. 775, 787 n. 1 (1998); EEOC v. Prospect Airport Services, Inc., 621 F.3d 991, 1000 (9th Cir. 2010) (A Title VII violation "is not established merely by evidence showing sporadic use of abusive language, gender-related jokes and occasional teasing."); Westendorf v. West Coast Contractors of Nevada, Inc., 712 F.3d 417 (9th Cir. 2013) (remarks on women's breast sizes, comments about tampons and multiple orgasms, and the suggestion the plaintiff clean his trailer in a French maid's outfit are not sufficiently pervasive); King v. Bd of Regents of Univ. Of Wisconsin Sys., 898 F.2d 533, 537 (7th Cir. 1990) (although a single act can be enough, repeated incidents create a stronger claim of hostile environment). "Though sporadic behavior, if sufficiently abusive, may support a [discrimination] claim, success often requires repetitive misconduct." Chalmers v. Quaker Oats Co., 61 F.3d 1340, 1345 (7th Cir.1995). In Brooks, the Ninth Circuit suggested that a hostile environment may result from a single instance of sexual harassment if the harassing conduct is sufficiently severe. Brooks, 229 F.3d at 925-27 (9th Cir. 2000).

In Brooks, a single incident where a fellow employee touched plaintiff's stomach and then her breast under her sweater, while very offensive, did not rise to the level of harassment under Title VII given the steps the city took to remove the fellow employee from the workplace. Id. To compare the severity of the conduct, the Ninth Circuit considered the facts in Al-Dabbagh where a single incident was held to be sufficient to state a claim on a motion to dismiss where the assailant "slapped [plaintiff], tore off

her shirt, beat her, hit her on the head with a radio, choked her with a phone cord and ultimately forced her to have sex with him." Al-Dabbagh v. Greenpeace, Inc., 873 F. Supp. 1105, 1108 (N.D. Ill 1994).  Al-Dabbagh escaped early the next morning and telephoned the police.  Id.  The Ninth Circuit in Brooks stated that its facts were much less severe than Al-Dabbagh.  Brooks, 229 F.3d at 926.

In Ellerth, the plaintiff sued the defendant employer for sex discrimination based on inappropriate touching and being sexually harassed by her superior under Title VII.  Ellerth v. Burlington Indus., Inc., 912 F. Supp. 1101, 1106 (N.D. Ill. 1996).  "The Seventh Circuit en banc reversed in a decision that produced eight separate opinions and no consensus for a controlling rationale."  Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 742 (1998).  While the district court granted summary judgment because it concluded that the employer could not be liable for the employee's actions, the district court concluded that there was a fact question as to whether the supervisor's actions created a hostile work environment.  Ellerth, 912 F. Supp. at 1124.

In Ellerth, the plaintiff went on her second job interview in March 1993 with Slowik, the vice president of sales and marketing for the defendant in the New York office.  Id. at 1106.  At the interview, he asked her inappropriate questions such as if she was married, if she was planning on having children and if she was "practicing" to have a family.  Id.  She was hired for a position in the Chicago office.  Id.  When she was promoted in 1994, Slowik became one of her supervisors.  Id.  She met Slowik when he came to Chicago, one or two days a month, and saw him when she traveled to cities for training.  Id.  She also spoke with Slowik about once a week by telephone. Id.

At a training she attended in New York, the plaintiff had more than five conversations with Slowik, and there were about five incidents where he told off-colored, offensive jokes.  Id.  During a lunch meeting with Slowik and the vice president of international sales, Angelo Brenna, he told over ten offensive jokes of a sexual nature.  Id.  During one of these jokes, he reached over and rubbed her knee

[14cv2763-GPC(JMA)]

under the table; she pulled her leg away and said nothing. Id. at 1106-07.  While walking outside, she was walking in front of Slowik and Brenna, when Slowik commented, "you have got great legs, Kim.  What do you think, Brenna." Id. at 1107. At another one week training one month later, she had dinner with Slowik, a sales representative and his wife.  Id.  After the dinner, Slowik invited the plaintiff to accompany him to the hotel lounge and she agreed.  Id.  The plaintiff testified that Slowik commented that the female band members had "nice breasts, nice legs and nice, skimpy outfits." Id.  "You are a little lacking in that area, aren't you Kim?" Id.  The plaintiff did not reply to Slowik's comments and she claims that Slowik told her that she "ought to loosen up." Id.  At the bar, Slowik allegedly stared at the plaintiff's breasts and legs. Id.  Upon leaving the bar, the plaintiff claimed that Slowik stated, "You know, Kim, I could make your life very hard or very easy at Burlington." Id. The plaintiff understood this comment to mean that she would have to have sex with Slowik to succeed at the company.  Id.

On another incident, the plaintiff was on the floor folding fabric, and Slowik walked by with another employee and commented, "on your knees again, Kim?" Id. at 1108.  Then, when Slowik was making phone calls from the plaintiff's office, she walked in to the office and Slowik commented, "It's nice to have my butt where your butt was, Kim." Id.  At a company holiday party in December 1993, the plaintiff claims that Slowik approached her husband, patted him on the shoulder and said, "You are a lucky man to have a woman like that," referring to the plaintiff.  Id.  In addition, the plaintiff alleges that Slowik patted her rear as he walked past her during the party. Id. Other incidents were when he interviewed for her promotion in March 1994, Slowik rubbed her knee and made an inappropriate comment, and when he called her to inform her she got the promotion, he made another sexually inappropriate comment that caused the plaintiff to cry. Id.  Lastly, when she was at a conference, on the last day, Slowik made a sexually inappropriate comment to the plaintiff about her "ass" as he was allegedly staring at her "back end" and this caused the plaintiff to run to the

[14cv2763-GPC(JMA)]

1   bathroom to cry. Id.

2   In addition to the in person interactions, the plaintiff spoke with Slowik by

3   phone once a week and there were sexual innuendoes and comments in all the

4   conversations. Id. at 1108-09. Although she was aware of the employer's policy

5   against sexual harassment she did not tell anyone in authority fearful of losing her job.

6   Id. at 1109. She eventually quit her job on May 31, 1994. The district court concluded

7   that there was a fact question as to whether the supervisor's actions created a hostile

8   work environment. Id. at 1124.

9           **a.      Hostile Housing Environment as it Applies to Plaintiff Macias**

10          Defendant first argues that any alleged sexual harassment occurred while she

11  was an independent contractor who cleaned properties for Defendant and the alleged

12  acts did not arise from their landlord-tenant relationship; therefore the FHA would not

13  apply. Plaintiff argues this is an issue for the fact-finder.

14          When Macias lost her job in 2006 and started to be late on her rent payments, she

15  began cleaning Defendant's properties to avoid being evicted. (Dkt. No. 47-5, Bobroff

16  Decl., Ex. 2, Macias Depo. at 266:2-13; 267:5-25.) At her deposition, she testified she

17  was paid $10 per hour.[8] (Id. at 102:3-11.) However, at times, if she could not pay her

18  rent timely, he would not pay her for cleaning. (Id. at 104:22-105:5.) She testified that

19  Defendant only sometimes paid her for cleaning his properties. (Dkt. No. 52-1,

20  Brancart Decl., Ex. 1, Macias Depo. at 94:9-10.) When she did not want to clean

21  Defendant's property, he made comments such as "I guess you don't want to work. You

22  don't want to live in my properties" or "you must not want to . . . make money to pay

23  your rent" or "seems like you don't want to work, so maybe you want to get evicted."

24  (Id. at 106:2-21; 264:9-25.) Defendant always connected Macias' failure to clean or

25

26

27

28          [8]In her deposition testimony, Macias stated she was paid $10 per hour but she
            was referencing the day at the Menlo house incident.

[14cv2763-GPC(JMA)]

1   work for him as potentially leading to eviction.  (Id. at 106:11-21.)  At a deposition[9] in

2   a case before the San Diego Superior Court, Defendant testified that renters, such as

3   Macias, would work for him, if they were behind in rent and it was a way of collecting

4   rent.  (Dkt. No. 52-7, Brancart Decl., Ex. 7, Lange Depo. at 15:23-25; 16:1-7.)

5        While at times Plaintiff was paid $10/hour when she cleaned for Defendant, at

6   other times, she was not paid because Defendant told her to take it off of the late fee.

7   (Dkt. No. 52-1, Brancart Decl., Ex. 1, Macias Depo. 102:3-11; 107:23-108:13; Dkt. No.

8   47-5, Bobroff Decl., Ex. 2 Macias Depo. at 108:6-16.)  Accordingly, the question of

9   whether the working relationship between Macias and Defendant was independent of

10  the landlord tenant relationship is a question for the fact finder.

11       Second, Defendant argues that the alleged behavior testified by Macias does not

12  amount to pervasive and severe acts to support a sexual harassment claim.  He argues

13  that Macias' own testimony shows that Defendant did not create a hostile living

14  environment because she only presents a handful of off-color comments made by

15  Defendant over the course of a decades long relationship.  Defendant acknowledges

16  that he is an old man who is not "politically correct" but his comments and behavior

17  do not meet the standard for sexual harassment.  In fact, he claims Macias and

18  Defendant are long time friends who often joked and laughed with each other.  Plaintiff

19  argues that a reasonable woman would conclude that Defendant's conduct was

20  intimidating, hostile, offensive and it was offensive to Macias.  Viewing the totality of

21  the circumstances and in the light most favorable to her, there are sufficient facts to

22  find that the harassment she endured was so severe or pervasive that a reasonable

23  woman would find it interfered with enjoyment of her housing.

24       The alleged sexual harassment began around 2006 or 2007 when Macias'

25  husband left and continued through until around June 2013.  Contrary to Defendant's

26  argument that there were only a handful of off-color comments, during these six to

27

28       [9]Defendant did not object to his deposition in the state court case. At the motion
    hearing, it was clarified that the deposition was taken as part of the state court unlawful
    detainer action.

seven years, Macias testified to continuous, inappropriate comments throughout her tenancy.  Defendant commented about her beautiful breasts more than ten times and he asked to see her beautiful breasts about three times.  When she cleaned, Defendant was always present, would sit on the couch with a shot of tequila and watch Macias clean.  While cleaning, he would make inappropriate sexual comments depending on how she was physically positioned.  He would bump into her breasts or brush his hands on her buttocks and asked to see her breasts while she worked.  Defendant also asked Macias to kiss him on several occasions.  She testified she always made a comment to divert his comments or would say "don't say that."  On two occasions, when Macias went to Defendant's house to pay rent around July 4, and when he asked her for a ride to the Del Mar Fair, Defendant told her to not worry because he was not going to do anything.  Macias made it known to Defendant that his comments and actions were unwelcome and Defendant knew his advances were not welcome when he told Macias not to worry because he was not going to do anything.  Based on facts presented by Macias, she has raised a material issue of fact as to whether Defendant's conduct was unwelcome and pervasive.

Moreover, there is an issue of fact whether Defendant's conduct was severe.  When Defendant locked the front and back doors of his home, approached Plaintiff and grabbed her around her waist, she stated she was scared and shaking.  (Dkt. No. 52-1, Brancart Decl., Ex. 1, Macias Depo. at 90:25-91:2.)  If she had not pushed him away or raised her voice, and told him that her brother and boyfriend were waiting outside, she believed he would have tried more.  (Id. at 263:16-20.)  After she pushed him away, Defendant backed off and according to Macias, he knew she was scared and not happy.  She testified that she cried after this incident, and also called Chavez, the handyman, crying about the incident.  (Id. at 93:6-11.)  In addition, she cried after the comment conditioning her late payment of rent on receiving a good "blow job."  She was so fearful of being alone with Defendant that she asked Chavez to inform her when he would be at Defendant's properties and would bring her daughters with her to clean.

1   Plaintiff has raised an issue of fact whether Plaintiff's conduct was severe.

2      Defendant highlights the fact that she went to the Del Mar Fair with Defendant;

3   however, she testified she felt obligated to attend for fear of getting evicted.   In

4   addition, sitting alone with Defendant in his car while he filled out a three-day notice

5   for her, while she was in desperate need of financial assistance, does not negate the fact

6   that she was subject to repeated acts of sexual harassment.

7      Plaintiff has raised a genuine issue of material fact whether Macias, subjectively,

8   and a reasonable woman, in Plaintiff's position, would consider the acts of Defendant

9   to constitute a hostile and abusive environment.   Thus, Court DENIES Defendant's

10   motion for summary judgment on Macias' claim under FHA for hostile housing

11   environment.

12            **b.      Hostile Housing Environment as it Applies to Plaintiff Rich**

13      As to Rich, Defendant also argues that the alleged acts of sexual harassment do

14   not amount to pervasive and severe acts to support a sexual harassment claim.   Rich

15   responds that a reasonable woman in Rich's position would have viewed the situation

16   as hostile.

17      Between November 2011 and March 2014, Rich asserts 10-20 instances of

18   alleged sexual harassment in which her husband was at home for more than half of

19   them. (Dkt. No. 50, SSUF, No. 7; Dkt. No. 52-2, Brancart Decl., Ex. 2, Rich Depo. at

20   70:12-23.)   According to Rich, these instances involved inappropriate comments,

21   inappropriate eye contact and hand gestures, and conversations about Defendant's

22   personal sex life. (Dkt. No. 52-2, Brancart Decl., Ex. 2, Rich Depo. at 45:16-19; 64:12-

23   65:5.)   Specifically, she testified that Defendant commented on how sexy she dressed

24   and looked; moved his eyebrows up and down; talked to her while his hands were in

25   his pockets; and jiggled coins or adjusted his pants near his groin area.   (Id. at 64:12-

26   14; 65:15-19; 65:20-23, 74:2-20, 102:23-103:10.)   Defendant also inquired whether

27   Rich had any dateable friends.   (Id. at 64:1-5.)   On two occasions, not close in time, she

28   believed he tried to hug her.   (Id. at 153:11-25.)   She testified, "it seemed like he was

trying to hug me." (Id. at 153:2-3.) There were times Defendant had his shirt off while he was working in the back lot, and he would talk about his sexual encounters with women. (Id. at 103:11-24; 105:10-19.)

Rich never told Defendant or her husband that Defendant's comments and his taking off his shirt were inappropriate or made her uncomfortable. (Id. at 75:24-76:8; 141:6-8.) If he was coming towards her, she would tell him to back off and he either just left or said "whatever." (Id. at 140:10-21.) Rich claimed that Defendant appeared unannounced at the property all the time and when Rich asked if he could give her notice, he said it was his property. (Id. at 54:15-57:4; 99:22-25.) However, Defendant owned the back lot behind Rich's property, and a utility truck parked on the property, and whenever he went on Rich's property, he was accessing either his back lot or utility truck. (Dkt. No. 46-6, Bobroff Decl., Ex. 3, Rich Depo. at 95:6-96:25; 97:1-8; 103:18-104:4.) Rich admitted that most of the interactions began when she went outside whenever she saw Defendant on the property. (Id. at 71:3-15.) It is undisputed that Defendant did not engage in any inappropriate physical touching, did not solicit sex from her, and never kissed her. (Dkt. No. 50, SSUF, Nos. 13, 14, 15.) The Court finds that the complained of acts over the course of two and a half years do not amount to severe conduct as defined under the FHA.

Rich testified that she first became fearful when Defendant said he would change the locks and said that he could come in and out of her house anytime, (Dkt. No. 52-2, Brancart Decl., Ex. 2, Rich Depo. at 86:5-11). At the motion hearing, Rich's counsel depicted a hostile housing environment based on an accumulation of several facts. He argued that when Rich became unemployed, making her financially vulnerable, she was home alone and stayed inside the house with drapes closed to avoid Defendant, and it was during that time that Defendant threatened that he would change the locks and said he could come in anytime he wanted to. However, after the Court's careful review of Rich's deposition transcript, there is no indication when Rich became unemployed. In fact, at the hearing, Rich's counsel was unable to specify when she became

[14cv2763-GPC(JMA)]

unemployed.  Second, at her deposition, Rich said she did not remember when the lock comment was made, whether it was in 2011 or in 2014.  Lastly, it appears the locks were changed due to fire safety concerns as the locks that were replaced prevented Rich and her husband from exiting the home.  (Dkt. No. 46-6, Bobroff Decl., Ex. 3, Rich Depo. at 157:1-158:25; Dkt. No. 52-2, Brancart Decl., Ex. 2. Rich Depo. at 159:1-17.) Moreover, the fact that Rich lives at the house with her husband makes Defendant's comments less egregious. See Salisbury v. Hickman, 974 F. Supp. 2d 1282, 1293 (E.D. Cal. 2013) (denying summary judgment on hostile housing environment taking into consideration that the plaintiff lived alone and the defendant trespassed inside her home uninvited and unexpected).  Therefore, these facts asserted to support a hostile housing environment are not supported by the record.

Subjectively, Rich felt she was subject to a hostile or abusive housing environment.   However, objectively, the Court concludes that Plaintiff has not demonstrated a genuine issue of material fact whether Defendant's comments and mannerisms were unwelcome.   Rich never told Defendant or her husband that Defendant's comments were inappropriate or that they made her uncomfortable. Many of the interactions began with Rich, on her own, stepping outside her house whenever Defendant was on the property.  The facts presented do not show that Defendant ever initiated the contact.

Also, Rich has not shown that there are triable issues of fact whether Defendant's acts were severe or pervasive.   True, Defendant's comments were offensive, inappropriate, and very flirtatious, as testified by Rich; however, Defendant's alleged conduct does not constitute "severe" conduct.  See E.E.O.C. v. Prospect Airport Servs., Inc., 621 F.3d 991, 998 (9th Cir. 2010) ("Title VII is not a 'general civility code.'" and mere awkwardness is not sufficient to satisfy the "severe or pervasive" element). While Rich alleges between 10-20[10] instances of inappropriate

_____

[10]Rich also alleges that Defendant told her she dressed sexy between 20 to 30 times.

[14cv2763-GPC(JMA)]

behavior, her husband was home for more than half of them, which lessens the severity and pervasiveness of Defendant's actions.  Furthermore, Defendant never physically touched Rich.  The Court concludes that a reasonable woman, in Rich's position, would not conclude the she was subject to a hostile or abusive housing environment. Thus, the Court GRANTS Rich's motion for summary judgment on Rich's claim of hostile housing environment under the FHA.

### 2.    Quid Pro Quo Sexual Harassment Only as to Plaintiff Macias

Plaintiff Macias asserts Defendant conditioned her continued tenancy on her giving him a blow job.  Defendant argues that Macias did not testify that Defendant conditioned her ability to pay rent late on her providing him with a "blow job" nor were there any other incidents of quid pro quo harassment.  Moreover, she did not suffer any adverse landlord tenant action by Defendant after the "blow job" comment.  Macias opposes.

"'Quid pro quo' sexual harassment occurs when housing benefits are explicitly or implicitly conditioned on sexual favors." Quigley, 598 F.3d at 947 (quoting Honce, 1 F.3d at 1089); see Craig v. M & O Agencies, Inc., 496 F.3d 1047, 1054 (9th Cir. 2007) ("To prove actionable harassment under a quid pro quo or 'tangible employment action' theory, [plaintiff] must show that [defendant] "explicitly or implicitly condition[ed] a job, a job benefit, or the absence of a job detriment, upon an employee's acceptance of sexual conduct.").  To establish quid pro quo sexual harassment under the employment laws, a plaintiff must show "that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands." Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753 (1998); Kohler v. Inter–Tel Techs., 244 F.3d 1167, 1179 (9th Cir. 2001) (a plaintiff seeking to establish quid pro quo harassment based on rejection of a defendant's request for sexual favors must show a causal connection between that rejection and some adverse employment action); Grieger v. Sheets, No. 87-C-6567, 1989 WL 38707 (N.D. Ill. 1989) ("quid pro quo" claim survived summary judgment where landlord refused to make repairs after tenant

rejected his explicit demands for sex).  In <u>Quigley</u>, when the tenant inquired about the likelihood of receiving her deposit back, the landlord "fluttered his hand against [the tenant's] stomach and said, 'My eagle eyes have not seen everything yet.'"  <u>Quigley</u>, 598 F.3d at 948.  When the tenant left the property, the landlord did not return the deposit.  <u>Id.</u> at 945.  At trial, the jury found in favor of the tenant.  <u>Id.</u> at 943.  The Eighth Circuit denied the landlord's motion for judgment as a matter of law stating that although the evidence was not overwhelming, there was sufficient evidence to support the jury's verdict.  <u>Id.</u>

Here, Defendant's statement that Macias could pay June rent late as long as he got a good "blow job" is conditioning a housing benefit in exchange for a sexual favor. Macias paid her June rent late in early around July 4, 2013.  On July 10, 2013, Defendant gave her a three day notice to quit.  Then in October 2013, Defendant filed an unlawful detainer action in state court.  Viewing the facts in the light most favorable to Macias, the non-moving party, Plaintiff has raised a genuine issue of material fact whether tangible housing actions, receiving a three day notice to quit and being subject to an unlawful detainer action, were taken against Macias for her refusal to give Defendant a "blow job."  Accordingly, the Court DENIES Defendant's motion for summary judgment as to Macias' claim under the FHA for "quid pro quo" sexual harassment.

## C.     FEHA and California Civil Code section 51.9

California's FEHA provides that it "shall be unlawful: (a) For the owner of any housing accommodation to discriminate against any person because of the race, color, religion, sex, marital status, national origin, ancestry, familial status, or disability of that person."  Cal. Gov't Code § 12955.  Meanwhile, section 51.9 prohibits "sexual advances, solicitations, sexual requests, demands for sexual compliance by the plaintiff or engaged in other verbal, visual, or physical conduct of a sexual nature or of a hostile nature based on gender, that were unwelcome and pervasive or severe" in a landlord - tenant relationship.  Cal. Civ. Code § 51.9.

Similar to the FHA, FEHA and section 51.9 prohibit sexual harassment and utilize the Title VII analytical framework. Brown v. Smith, 55 Cal. App. 4th 767, 782 (1997) (applying FHA sexual harassment analysis to FEHA housing discrimination claims based on sexual harassment); Hughes v. Pair, 46 Cal. 4th 1035, 1044, 1048 (2009) (applying FEHA and FHA analysis pertaining to sexual harassment in the workplace to Civil Code section 51.9 prohibiting sexual harassment in relationships between professional services and their clients, outside the workplace, including landlord-tenant).

The elements and analysis for sexual harassment claims under the FEHA and section 51.9 mirror the elements and analysis under the FHA and under Title VII. See Hughes, 46 Cal. 4th at 1048-49 (2009) (analyzing section 51.9); Brown, 55 Cal. App. 4th at 780-84 (analyzing the FEHA).  Both parties' arguments as to the sexual harassment claims under these state statutory provisions are the same as the ones raised on the FHA claim.  Accordingly, for the same reasons set forth on the FHA claim, Defendant is not entitled to summary judgment on the FEHA and section 51.9 claims for hostile housing environment as to Macias and Defendant is entitled to summary judgment on the FEHA and section 51.9 claims as to Rich.  The Court DENIES Defendant's motion for summary judgment on Macias's FEHA and section 51.9 claims based on hostile housing environment and GRANTS Defendant's motion for summary judgment on Rich's FEHA and section 51.9 claims based on hostile housing environment.

FEHA and section 51.9 also  impose liability for quid pro quo sexual harassment. Hughes, 46 Cal. 4th at 1049.  For the same reasons stated above on the FHA cause of action, the Court DENIES Defendant's motion for summary judgment on Macias' quid pro quo sexual harassment claim under these state statutes.

**D.    Unruh Civil Rights Act**

Defendant argues that the Unruh Act claims are not applicable for acts related to a landlord-tenant relationship because such a relationship is specifically

[14cv2763-GPC(JMA)]

1    encompassed by the creation of section 51.9 by the state legislature in 1994 and cites

2    to Brown, 55 Cal. App. 4th at 775 (treating section 51.9 as an Unruh Civil Rights Act

3    claim). In their analysis, Plaintiffs combine the Unruh Act claim with the FHA, FEHA,

4    and section 51.9 claims and assert that the analysis is the same.

5          In Stamps, the Court of Appeal noted that many courts have "consistently

6    described as Unruh Civil Rights Act claims causes of action based under seemingly

7    related provisions set forth in sections of the Civil Code that follow section 51."

8    Stamps v. Superior Court, 136 Cal. App. 4th 1441, 1450 (2006). However, the "Unruh

9    Civil Rights Act comprises *only* section 51." Id. (emphasis in original); Hughes, 46

10   Cal. 4th at 1044 n. 1 (while 51.9 has been described as being part of the Unruh Civil

11   Rights Act, Civil Code section 51 is the only statute comprising the Unruh Civil Rights

12   Act.). In Stamps, the Court noted that the Brown case also incorrectly treated section

13   51.9 as an Unruh Civil Rights claim, Stamps, 136 Cal. App. 4th at 1450. Therefore,

14   Defendant's argument relying on Brown is misplaced.

15         It appears the parties have treated the analysis of section 51.9 and the Unruh Act

16   the same. The Complaint alleges a cause of action for the Unruh Civil Rights Act and

17   a separate cause of action for section 51.9. But in their opposition briefs, both

18   Plaintiffs assert the analysis of the FHA, FEHA, section 51.9 and the Unruh Act is the

19   same and do not distinguish between the elements of the statutory provisions in the

20   Unruh Act and section 51.9. (See Dkt. No. 49, P's Opp. at 15:17-25.) Similarly,

21   Defendant has improperly treated section 51.9 as an Unruh Act claim.

22         The Unruh Act provides that "all persons . . . are free and equal, and no matter

23   what their sex . . . are entitled to the full and equal accommodations, advantages,

24   facilities, privileges, or services in all business establishments of every kind

25   whatsoever." Cal. Civil Code § 51(b). The Unruh Act "'is a public accommodations

26   statute that focuses on discriminatory behavior by business establishments. . . .'"

27   Stamps, 136 Cal. App. 4th at, 1452 (citation omitted). The purpose of the Unruh Act

28   is "'to compel recognition of the equality of all persons in the right to the particular

service offered by an organization or entity covered by the act.'" Id. at 1448 (citation omitted); see Alcorn v. Anbro Eng'g, Inc., 2 Cal. 3d 493, 500 (1970) (Legislature did not intend to include discriminations other than those made by a business establishment "in the course of furnishing goods, services or facilities to its clients, patrons or customers"). It is established that section 51 does not apply to employment actions. Rojo v. Kilger, 52 Cal. 3d 65, 77 (1990). In Beliveau, a sexual harassment case under the FHA and related state law claims, including the Unruh Act, the district court noted that the California Supreme Court had not yet precluded sexual harassment claims under the Unruh Act. Beliveau v. Caras, 873 F. Supp. 1393, 1404 (C.D. Cal. 1995) (while economic and sex discrimination based on disparate impact are not cognizable under the Unruh Act, the Supreme Court has not precluded sexual harassment claims under the Unruh Act). In Beliveau, the district court concluded that the sale or rental of real property is covered by the Unruh Act. Id. at 1401 (citing 58 Ops. Atty. Gen. 608 (August 21, 1975).)

In Ramirez, the manager of an apartment building entered a female tenant's residence without permission, went into the bedroom, opened her dresser drawer and removed and sniffed the tenant's underwear. Ramirez v. Wong, 188 Cal. App. 4th 1480, 1483 (2010). The court of appeal held there was no discrimination under the Unruh Act because such conduct had nothing to do with the denial of equal accommodations and facilities on the basis of sex. Id. at 1485.

By failing to address the elements of the Unruh Act, Defendant, as the moving party, has not met his burden to demonstrate that the plaintiffs have failed to make a showing sufficient to establish any of the elements of the Unruh Act claim. See Celotex Corp., 477 U.S. at 323. Thus, the Court DENIES Defendant's motion for summary judgment on the Unruh Civil Rights Act claim as to Plaintiffs Macias and Rich.

**E.    California Ralph Act, California Civil Code 51.7**

The Ralph Act, California Civil Code section 51.7, protects persons from "any

[14cv2763-GPC(JMA)]

violence, or intimidation by threat of violence, committed against their persons" based on sexual discrimination.  Cal. Civil Code 51.7.  "The statute requires violence or threat of violence."  Ramirez, 188 Cal. App. 4th at 1486.  The standard is whether "a reasonable person, standing in the shoes of the plaintiff, [would] have been intimidated by the actions of the defendant and perceived a threat of violence."  Winarto v. Toshiba America Elec. Components, Inc., 274 F.3d 1276, 1289 (9th Cir. 2001).  Specifically, the question is whether a reasonable woman in the plaintiff's position would have been intimidated and perceived a threat of violence.  Id.

In Zamora, the Court denied summary judgment on the Ralph Act because Plaintiff created a triable issue as to whether a reasonable woman in her position would have perceived a threat of violence when the defendant  allegedly barred the trailer door with his arm.  Zamora v. Sacramento Rendering Co., No. Civ. S-05-789 DFL-KJM, 2007 WL 137239, at *7 (E.D. Cal. Jan. 17, 2007).  While the defendant did not make any further attempt to detain her, did not touch her as she left, did not follow or chase her and did not verbally threaten her, the gesture of blocking someone's exit might reasonably be perceived as a threat of violence.  Id.  The district court determined that it cannot conclude as a matter of law that a reasonable woman would not perceive a threat of violence in the defendant's alleged conduct.  Id.

### 1.    Ralph Act as to Macias

Defendant argues that Macias has not alleged that Defendant committed or threatened to commit any violence against her.[11]  Plaintiff argues that there was a threat of violence when Defendant locked Macias inside his house with him and grabbed her and that the threat was evident when she went to pay her June rent after the "blow job" incident and he stated, "Don't worry. I'm not going to do anything."

The facts in this case are more egregious than in Zamora.  One day when Macias went to drop off the rent payment at Defendant's house, he locked the front and back

---

[11]Without citing to the record, Defendant argues that Macias testified that he never threatened harm to her and never threatened violence.

doors, grabbed her around her waist, told her she had beautiful breasts and asked whether he could kiss her.  (Dkt. No. 52-1, Brancart Decl., Ex. 1, Macias Depo. at 90:25-91:15.)  She testified she was really scared and shaking.  (Id. at 90:25-91:2; 91:21-23.)  If she did not push away or raise her voice and let him know that her brother and boyfriend were waiting outside, she believed he would have tried more. (Id. at 263:16-20.)  After this incident, she was upset that she was crying and called Chavez to let him know.  (Id. at 93:6-11.)  Moreover, the June 24, 2013 "blow job" incident, caused her to be upset, scared, and devastated.  (Id. at 64:15-18; 66:14-20; 66:21-67:25; 80:16-81:2.)

The Court concludes there is a question of fact whether a reasonable woman in Macias' position would have been intimidated and perceived a threat of violence. Accordingly, the Court DENIES Defendant's motion for summary judgment as to Macias' Ralph Act claim.

**2.    Ralph Act as to Rich**

Defendant argues that Rich has not alleged that Defendant committed or threatened to commit any violence against her.  Rich alleges that she first felt frightened when Defendant said he was going to change her locks and that he could come in and out of her house whenever he wanted to, and his comment was an implied threat of violence to her.

In this case, despite the inappropriate comments, conversations and offensive behavior, Defendant did not ever physically touch Rich, or threaten harm or violence against her.  Her allegation that Defendant's comments about replacing the locks, as discussed, above, is without support.  It appears the locks were changed due to fire safety concerns as the locks that were replaced prevented Rich and her husband from exiting the home. (Dkt. No. 46-6, Bobroff Decl., Ex. 3, Rich Depo. at 157:1-158:25; Dkt. No. 52-2, Brancart Decl., Ex. 2. Rich Depo. at 159:1-17.)  The Court concludes that Plaintiff Rich has not raised an issue of fact that a reasonable woman, standing in Rich's shoes, would have been intimidated by Defendant's comment or perceived it as

1  a threat of violence.  Thus, the Court GRANTS Defendant's motion for summary

2  judgment as to Rich's Ralph Act claim.

3  **F.    Breach of the Covenant of Quiet Use and Enjoyment**

4          In their complaint, Plaintiffs Macias and Rich allege a breach of the covenant of

5  quiet use and enjoyment pursuant to California Civil Code §§ 1927 and 1940.2.[12]  (Dkt.

6  No. 49 at 23-24.)  Defendant moves  for summary judgment arguing that Macias and

7  Rich cannot seek relief for breach of covenant of quiet use and enjoyment because

8  Macias was not evicted, either actually or constructive, and remained in possession of

9  the property even after Defendant sold the property, and Rich currently remains a

10  tenant.  Plaintiffs respond that a tenant need not surrender possession of the property

11  to state a claim for breach of the quiet use and enjoyment.

12          "An agreement to let upon hire binds the letter to secure to the hirer the quiet

13  possession of the thing hired during the term of the hiring, against all persons lawfully

14  claiming the same."  Cal. Civil Code § 1927.  It is long established that absent  contrary

15  language, "every lease contains an implied covenant of quiet enjoyment."  <u>Petroleum</u>

16  <u>Collections Inc. v. Swords</u>, 48 Cal. App. 3d 841, 846 (1975); <u>Beliveau v. Caras</u>, 873

17  F. Supp. 1393, 1401-02 (C.D. Cal. 1995) (every lease contains an implied covenant by

18  the lessor of quiet enjoyment and possession during the term) (quoting 4 B. Witkin,

19  Summary of California Law, "Real Property" (9th ed. 1987) § 573).  "To be actionable,

20  the landlords act or omission must substantially interfere with a tenants right to use and

21  enjoy the premises for the purposes contemplated by the tenancy."  <u>Andrews v. Mobile</u>

22  <u>Aire Estates</u>, 125 Cal. App. 4th 578, 589 (2005).

23          Under a breach of the covenant of quiet use and enjoyment, a tenant may either

24  surrender possession and the tenant will not be responsible for rent or a tenant may

25  elect to "to stand upon the lease, remain in possession and sue for breach of contract

26  damages."  <u>Id.</u> at 590 (citations omitted); <u>see also</u> <u>Guntert v. City of Stockton</u>, 55 Cal.

27  ─────────────

28  [12]The Court notes that Macias' complaint also alleges breach of the covenant of quiet use and enjoyment pursuant to California Civil Code § 1940.2; however it appears she no longer pursues a claim under that section.  (Dkt. No. 1, Compl. ¶ 33.)

App. 3d 131, 140 (1976).  In <u>Salisbury</u>, the district court held that the resident's breach of covenant of quiet use and enjoyment was not barred because she did not move from the mobile home park.  <u>Salisbury</u>, 974 F. Supp. 2d at 1295.

Accordingly, Defendant's argument is without merit and the Court DENIES the motion for summary judgment as to Plaintiffs Macias[13] and Rich.

**G.   Invasion of Privacy**

In their opposition,[14] Plaintiffs assert a claim of invasion of privacy based on the common law tort of intrusion citing to <u>Hernandez v. Hillsides, Inc.</u>, 47 Cal. 4th 272, 286 (2009) (employee sued employer for invasion of privacy who had placed surveillance video cameras in office employees shared).  Defendant argues that Plaintiffs cannot prove the elements of invasion of privacy.

"A privacy violation based on the common law tort of intrusion has two elements.  First, the defendant must intentionally intrude into a place, conversation, or matter as to which the plaintiff has a reasonable expectation of privacy.  Second, the intrusion must occur in a manner highly offensive to a reasonable person.  Nonetheless, the cause of action recognizes a measure of personal control over the individual's autonomy, dignity, and serenity.  The gravamen is the mental anguish sustained when both conditions of liability exist."  <u>Hernandez</u>, 47 Cal. 4th at 285 (citations omitted).

On the first element, the defendant must have "'penetrated some zone of physical or sensory privacy . . . in violation of the law or social norms."  <u>Id.</u> at 286.  The expectation of privacy must be objectively reasonable.  <u>Id.</u>  To determine reasonableness of privacy expectations, courts look to "(1) the identity of the intruder, (2) the extent to which other persons had access to the subject place, and could see or hear the plaintiff, and (3) the means by which the intrusion occurred."  <u>Id.</u> at 287.  The

---

[13]The Court notes that neither party has asserted the existence of the threshold issue of whether there was a lease agreement between Defendant and Macias.

[14]The Court notes in their complaint, Macias and Rich assert an invasion of privacy based on Civil Code sections 43, 1708, 3333 and the California Constitution, Art. I § 2.  It is not clear whether Plaintiffs have abandoned these bases for invasion of privacy.

[14cv2763-GPC(JMA)]

second elements involves a "'policy' determination as to whether the alleged intrusion is 'highly offensive' under the particular circumstances." Id. "Relevant factors include the degree and setting of the intrusion, and the intruder's motives and objectives." Id.

### 1. Invasion of Privacy as to Macias

Defendant solely argues that Macias cannot allege the elements of invasion of privacy because all the alleged allegations of sexual harassment occurred outside of her home. Macias contends that Defendant invaded her right to privacy, by demanding that she give up her most intimate decision, her freedom to decide with whom she shared an intimate, sexual relationship.

Defendant's argument that an invasion of privacy needs to physically occur at the victim's home is not supported by legal authority.[15]  Because Defendant has failed to meet his burden of demonstrating that Macias has failed to make a showing sufficient to establish any of the elements of invasion of privacy on summary judgment, the Court DENIES Defendant's motion for summary judgment on Macias' invasion of privacy cause of action.  See Celotex Corp., 477 U.S. at 323.

### 2. Invasion of Privacy as to Rich

Defendant contends that Rich cannot prove the elements of invasion of privacy because the alleged acts of sexual harassment occurred outside of Rich's home while Defendant was on the property to access his back lot or collect rent from the utility truck.  Defendant argues that it was Rich that left her home and started conversations with Defendant and all encounters occurred outside in the open.  In response, Rich asserts that she had an expectation of privacy in her property that Defendant repeatedly violated and the intrusion was highly offensive.

Here, Rich has an expectation of privacy in her home but she has not demonstrated that she had an expectation of privacy in the property, owned by Defendant, that abutted her property.  Defendant appeared at the property in order to

---

[15]Neither party has presented any legal authority, which was confirmed at the motion hearing, where an invasion of privacy claim was raised in conjunction with a sexual harassment claim.

access his back lot or work on the utility truck.  Moreover, on many of the occasions, Rich went outside which prompted the interaction with Defendant.  Rich has not raised a triable issue of fact and the Court GRANTS Defendant's motion for summary judgment on Rich's invasion of privacy claim.

### Conclusion

As to Macias, the Court DENIES Defendant's motion for summary judgment on all causes of action.  As to Rich, the Court GRANTS in part and DENIES in part Defendant's motion for summary judgment.  Specifically, the Court GRANTS Defendant's motion for summary judgment on the FHA, FEHA, Civil Code section 51.9, Ralph Act, and invasion of privacy causes of action.  The Court DENIES Defendant's motion for summary judgment on the Unruh Civil Rights Act and the breach of the covenant of quiet use and enjoyment causes of action.

IT IS SO ORDERED.

DATED:  April 1, 2016

HON. GONZALO P. CURIEL
United States District Judge

[14cv2763-GPC(JMA)]